Lewis **SABLOSKY** et al.

v.

**PARAMOUNT FILM DISTRIBUTING CORPORATION** et al.

No. 13090.

United States District Court
E. D. Pennsylvania.

Dec. 13, 1955.

Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., for plaintiffs.

Wolf, Block, Schorr & Solis-Cohen, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

GRIM, District Judge.

After a long trial in this private motion picture antitrust case the jury re-

turned a verdict for plaintiffs in the amount of $425,000, which the Court trebled. Defendants have filed motions for judgment notwithstanding the verdict and for a new trial.

The gravamen of plaintiffs' complaint is that from 1939 to 1951 defendants unreasonably and as the result of a conspiracy denied plaintiffs the right to exhibit pictures on a territorial release basis at their Norris and Grand theatres in Norristown, Pennsylvania; that is, that defendants, the seven major motion picture distributors, unreasonably and as the result of a conspiracy granted the downtown Philadelphia first-run theatres clearance over the Norristown theatres.

One of plaintiffs' principal problems was to prove that their Norristown theatres were not in substantial competition with the downtown Philadelphia first-run theatres. Defendants' position, on the other hand, was that the two groups of theatres were in substantial competition and that therefore clearances in favor of the Philadelphia theatres were justified in accordance with the usual economic criteria.

Defendants' first contention in support of its motions is that there was no credible evidence of a demand for territorial release.

David Sablosky, one of the plaintiffs and one of the partners trading as the Norris Amusement Company, testified that at the end of 1938 or the beginning of 1939, after the Norris theatre had been air-conditioned in 1938, he and his three brothers, Abe, Lewis, and Nathan visited the Philadelphia branches of the defendants and requested territorial release for the Norristown theatres from nine men associated with the local branches. Of these nine men, eight were living at the time of the trial and each of the eight men denied that any Sablosky had ever requested territorial release from him. The jury resolved the question of credibility raised by this conflicting testimony in favor of plaintiffs.

David Sablosky also testified that during these visits defendants suggested that plaintiffs write a letter embodying their request and that the plaintiffs did write such a letter and sent the same letter to each defendant. He testified he composed part of the letter, to the effect that Norristown was a separate and independent metropolitan area and that the Norristown theatres should have a run based on national release in Norristown instead of having to wait until after pictures had played in Philadelphia. He testified further that Abe Sablosky completed the letter by stating that if they had national (territorial) release, the grosses in Norristown would improve tremendously and it would be an asset to the distributors to give Norristown national release. They also mentioned the air-conditioning in the letters, he testified, and said that they had gone into extensive alterations to put it in.

Neither plaintiffs nor defendants could produce any copies of these 1939 letters and defendants have taken the position that the letters were not sent. Nor could plaintiffs produce a single reply to these letters. However, the jury had a right to believe David Sablosky's testimony that the letters had been sent to defendants and to find in accordance with testimony that they had all been lost during the intervening sixteen years.

As further support for their contention that plaintiffs did not demand territorial release in 1938 or 1939 defendants produced an attorney who testified that Abe Sablosky told him in 1940 that he approved Philadelphia's clearances over Norristown in 1940 and that he had stated this to the Justice Department. Defendants argue that Abe's statement in 1940 is inconsistent with David's statement that the Sabloskys have been demanding territorial release since 1938 or 1939. This contention is nothing more than proper argument to the jury.

David also testified that plaintiffs renewed their requests for territorial re-

lease orally from time to time during the period in suit. He testified that they finally succeeded in 1949, upon one of the occasions when they were demanding territorial release, in obtaining a reduction in clearance from twenty-one to seven days from defendant Twentieth Century-Fox (except that it was fourteen days if pictures played in the Warner theatres). Thereafter, he stated, plaintiffs again renewed their demands for national release with all the defendants and defendants suggested that plaintiffs, on the strength of the Twentieth Century-Fox reduction, should write in and request similar reductions to seven days, as a step in their obtaining national release. Lewis Sablosky wrote such letters in November of 1949, obtained reductions to fourteen days in the following year from Columbia and Paramount, and continued thereafter, David stated, to press their demands for national release.

Except for the addressee, the 1949 letters were identical. In them Lewis Sablosky requests an availability seven days after first-run Philadelphia and states that "we should get seven days after first-run Philadelphia and we would get the benefit of the Philadelphia and National advertising." The letters also contained the postscript: "Fox has already granted us seven days after first-run Philadelphia and we would like you to do likewise."

Lewis Sablosky, who was called as on cross-examination by the defendants, testified that the 1949 letters were written at the suggestion of defendants and on their promise that plaintiffs would be in line for national release after they first asked for and received a reduction to seven days.

Defendants contend that the postscript relating to the Fox change in clearance furnishes the only true reason for the 1949 letters and completely negates the Sabloskys' claim that they had been requesting, or were then requesting, territorial release. Defendants also point out that in response to the 1949 letter Paramount reduced Phil-

adelphia's clearance over Norristown from twenty-one to fourteen days, which prompted Lewis Sablosky to voice his dissatisfaction to Paramount in his letter of January 9, 1950:

> "* * * I cannot understand why we should not be entitled to seven days after Philadelphia first-run.
>
> "We should be really entitled to day and date with Philadelphia first-run, and I tried to make it easy for you in asking for seven days, and insist on getting it."

Defendants contend that the only inference that can be taken from this 1950 letter, as well as from the 1949 letters, is that plaintiffs had never asked for national release. This, too, is proper argument to the jury and not a question of law.

Of the fourteen representatives of the defendants from whom David Sablosky testified he requested territorial release from 1939 to 1949, three are dead and eleven took the stand and denied that any Sablosky had ever made such a request. Again this contradiction presented a question of credibility to be resolved by the jury.

In asking the Court to grant judgment notwithstanding the verdict or a new trial on the issue of demand, the defendants place great reliance on the case of Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561. The district court tried that case without a jury and awarded plaintiff damages for the periods May 2 to August 15, 1946, and from December 26, 1946 to July 20, 1948. The Court of Appeals for the Seventh Circuit held that there was no credible evidence to support the finding that plaintiff had demanded first runs in April 1946 and that therefore the plaintiff could not recover for the period from May to August of that year, before the theatre was closed for extensive remodeling at a cost of $200,000. The court affirmed the judgment as to the latter period, from December 1946 to July 1948, in the amount of $313,-858.10, which was trebled.

The facts were these: Plaintiff, Milwaukee Towne Corporation, acquired the Towne theatre in April 1946, at which time the theatre had been running only second-run pictures. Pursuant to an arrangement with United Artists that it could supply first runs, plaintiff closed the theatre on August 15, 1946, remodeled it as mentioned above, and reopened on December 26, 1946. After the reopening plaintiff got an exclusive first-run on United Artists pictures for six months and in June 1947 wrote the defendants: " 'We are now desirous of negotiating with you for first-run product in the City of Milwaukee' " and, according to the court, "Some complied in part and some refused." The court also pointed out that the sole witness (Spheeris) to testify as to the demand "testified that each of the requests or demands which he made upon the defendant distributors was in the presence of his partner, Papas, yet the latter, while present during the trial, failed to corroborate Spheeris, in fact was not called as a witness." 190 F.2d 567. However, the court seems to have relied chiefly on the evidence that the plaintiff's theatre was not suitable for first-run films during the earlier period before the remodeling: "The point is that the clear recognition by plaintiff and others that its theatre was unsuitable for such purposes [i. e., first-run pictures] militates strongly against the testimony of Spheeris that such a demand was made." 190 F.2d 568.

Assuming this holding on demand with respect to the first damage period to be good law [1] and disregarding the fact that Milwaukee Towne was a non-jury case, the facts on the question of demand in the present case are clearly distinguishable from those in Milwaukee Towne. Lewis Sablosky, although present during the trial and not called as corroborating witness by plaintiffs, was called as on cross-examination by de-fendants and, when asked whether there was any reason he had not been called by his attorney to testify, replied: "Well, it would be a duplication of whatever was testified to [by David Sablosky]." Abe Sablosky and the three remaining Sablosky brothers, all of whom were plaintiffs, were too ill to testify. (One of them, Thomas, died on April 19, 1955). And, more importantly, in the present case plaintiffs' theatres were admittedly physically suitable for a first-run operation immediately before 1939, when plaintiffs testified they made their demands.

■ The conflicting evidence on demand raised questions of credibility for the jury, who resolved them in favor of plaintiffs. Their conclusion was a reasonable one and will not be disturbed.

Defendants' second contention in support of its motions is that there was prejudicial error in the handling of the decrees and other materials from United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, a civil antitrust suit begun by the United States Government against these same defendants in 1938. The following were the seven Paramount case decrees introduced: (1) Decree against RKO, November 8, 1948; (2) Decree against Paramount, March 3, 1949; (3) Decree against Loew's, Warner Brothers and Twentieth Century-Fox, February 8, 1950; (4) Decree against Columbia and Universal, February 8, 1950; (5) Decree against Warner Brothers, January 4, 1951; (6) Decree against Twentieth Century-Fox, June 7, 1951; (7) Decree against Loew's, February 7, 1952. The decrees against RKO (1948) and Paramount (1949) are consent decrees. The decrees of February 8, 1950, referred to and incorporated by reference findings of fact and conclusions of law, which the plaintiffs also put in evidence.

Before plaintiffs' counsel was permitted to read portions of the seven decrees and a number of findings of fact and

---

1. But see Clark, "The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits", 52 Mich.L.R. 363, 388 (1954).

conclusions of law incorporated therein to the jury, the Court made a prefatory statement to the jury defining the scope and purpose of this evidence. The Court first read to the jury the pertinent portion of the following applicable statute, Section 5 of the Clayton Act, 15 U.S. C.A. § 16:

"A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be *prima facie* evidence against such defendant in any suit or proceeding brought by any other party against said defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto; Provided, This section shall not apply to consent judgments or decrees entered before any testimony has been taken."

The jury also was told by the Court that it was permitting the reading of (1) "only such portions of the final decrees and findings of fact and conclusions of law incorporated therein as relate to the specific charges of conspiracy contained in the complaint in the present case" and (2) "those portions of the decrees which relate directly to the evidence of the particular acts of the defendant distributors which are claimed to be illegal in the case now on trial."

The jury also was instructed that the Paramount decrees "are based on findings that the same distributor-defendants as those named in this present suit had up through the year 1945 engaged in a nationwide conspiracy to establish uniform systems of runs, clearances, and admission prices in the principal cities of the United States in order to protect their first-run licenses from competition in these areas; and that these defendants had discriminated in favor of theatre circuits, affiliated with one or more of them, in granting

various license privileges." The Court also emphasized that the Paramount decrees dealt with a nationwide conspiracy and not specifically with the alleged conspiracy relating to the Norristown theatres and that plaintiffs were required to present additional evidence to relate the presumed nationwide conspiracy to the Norristown situation. These instructions were also summarized in the Court's charge at the conclusion of the case.

Defendants contend that the Court erred in permitting plaintiffs' counsel to select and read portions of the Paramount decrees, findings, and conclusions to the jury, instead of the Court itself instructing the jury as to the issues that were determined against the defendants in the prior suit.

The Supreme Court of the United States in Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408, 415, 95 L.Ed. 534, outlined the following procedure for handling prior decrees pursuant to Section 5 of the Clayton Act:

"In summary the trial judge should (1) examine the record of the antecedent case to determine the issues decided by the judgment; (2) in his instructions to the jury reconstruct that case in the manner and to the extent he deems necessary to acquaint the jury fully with the issues determined therein; and (3) explain the scope and effect of the former judgment on the case at trial."

■ The Emich case gives the trial judge broad discretion as to the manner of presenting the decided issues of the prior suit to the jury. There is nothing in the law to prohibit the trial judge from outlining, for the benefit of counsel and jury, in general terms the scope and effect of the prior judgment as evidence in the present action and then permitting counsel to perform the physical task of reading materials from the prior case in order "to acquaint the jury fully with the issues determined

therein." That is exactly what was done in the present case. As between the trial judge and counsel it is unimportant who presented the materials from the Paramount case to the jury. The only important question is whether the reading of any of these materials to the jury was prejudicial error in the case at hand.

■ Defendants' contention that the consent decrees entered against RKO (1948) and Paramount (1949) were inadmissible is answered by the very language of the proviso in Section 5, which provides that consent decrees are inadmissible if they are "entered before any testimony has been taken." The consent decrees entered against RKO and Paramount were entered after testimony had been taken and therefore were admissible under Section 5 of the Clayton Act. Homewood Theatre, Inc., v. Loew's, Inc., D.C.D.Minn.1952, 110 F. Supp. 398, 409–411; Twentieth Century-Fox Film Corporation v. Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846.

■ It is well settled that the five other decrees in the Paramount case, which were not consent decrees, are admissible as *prima facie* evidence that the local system of runs and clearances was a part of the national system which had been condemned in the Paramount case, if plaintiffs first show that defendants are engaged in the same illegal practices locally as they were nationally. Loew's, Inc., v. Cinema Amusements, Inc., 10 Cir., 1954, 210 F.2d 86, 90; Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., supra; Homewood Theatre, Inc., v. Loew's, Inc., supra.

■ Defendants contend that it was error for the Court to permit any findings of fact and conclusions of law filed with the Paramount decrees of 1950 to be read to the jury. In answer to this contention, the Supreme Court in the Emich case stated that the trial judge may resort "to such portions of the record, including the pleadings and judgment, in the antecedent case as he

may find necessary or appropriate to use in presenting to the jury a clear picture of the issues decided there * * *." 340 U.S. at pages 571–572, 71 S.Ct. at page 415. And in the Brookside case the Court of Appeals for the Eighth Circuit, after stating that the trial court "permitted the reading of such portions of the final decree and such portions of the findings of fact and conclusions of law as related to the charge contained in the complaint", held that "There was no prejudicial error in admitting this testimony." 194 F.2d 853.

Defendants' principal contention in reference to the admission of materials from the Paramount case is that many of the forty-four findings of fact read to the jury contained highly prejudicial statements which were irrelevant to the issues in the present case. Plaintiffs' counsel read portions of the decrees and findings relating to runs and clearances, price-fixing, block-booking and the use of master and franchise agreements by the present defendants. It is immediately apparent that the Paramount case findings relating to runs and clearances and the use of master and franchise agreements are relevant to the main issue in the present case, namely, whether plaintiffs were deprived of a first-run by a conspiracy in unreasonable restraint of trade by the same defendants as those in the Paramount case.

■ But defendants argue that the Paramount case findings relating to price-fixing and block-booking read to the jury were irrelevant and prejudicial since plaintiffs offered no evidence that such practices damaged them. Although the Paramount findings on price-fixing and block-booking admittedly have no bearing on the instant problem of damages, these findings are closely related to the question of conspiracy and its motivation and purpose in the present case. Plaintiffs first introduced evidence of price-fixing and block-booking specifically pertaining to the Norristown theatres as part of their proof of an illegal local conspiracy. They then in-

troduced findings on these subjects from the Paramount case in order to relate the local conspiracy to the nationwide conspiracy found to exist by the Supreme Court. I conclude there was no error in the admission in evidence of these relevant findings.

■ Defendants are correct in their contention that plaintiffs' counsel improperly advised the jury that the burden of proof was shifted to defendants. One of the conclusions of law read to the jury was: "Whenever any clearance provision is attacked as not legal under the provisions of this [the Paramount] decree, the burden shall be upon the distributor to sustain the legality thereof." This provision was read to the jury several times. A careful reading of the provision reveals clearly that the burden of proof shifts only when clearance is attacked "under the provisions of * * * [the Paramount] decree." This type of device is commonly used in antitrust decrees for the purpose of .making it easier for the Government or private victims of antitrust violations to enforce the terms of decrees in their favor. Plaintiffs in the present case, of course, were not parties to the Paramount litigation and have no standing to enforce the Paramount decrees. The Expediting Court in the Paramount case obviously did not intend to shift the burden of proof in private clearance cases, for it stated that "the decision of such controversies as may arise over clearances should be left to local suits in the area concerned." 66 F.Supp. 323, 342.

■ It may be that the reading of portions of the Paramount decrees relating to burden of proof might have tended to mislead the jury at the time they were read. But any misunderstanding on the part of the jury, if there was one, was corrected later by my charge in which I instructed the jury clearly and correctly and in detail on the subject of burden of proof. In my charge I said "that in order to recover a verdict in their favor, the bur-den is on the plaintiffs to prove by the fair weight of the credible evidence in the case that the clearances constituted an unreasonable restraint of trade" (N.T. 4114). I spelled out in considerable detail the burdens plaintiffs had to meet in order to prove their case and recover a verdict. The charge might have been more helpful to the jury if it had specifically directed the jury to disregard plaintiffs' counsel's quotations from the Paramount decrees on burden of proof which counsel had made during the early days of the trial. However, defendants submitted no request for charge on this point. Furthermore, no specific exception to the charge was taken by either side.

■ The plaintiffs offered evidence of damages through the testimony of Sidney E. Samuelson, who testified as an expert witness over defendants' objections. There was no merit in defendants' challenge of Samuelson's qualifications. He began his career in the motion picture industry in 1914 and since then has engaged in every phase of the motion picture exhibition business including the operation of his own first-run theatre in Newton, New Jersey, and buying and booking for the Hildinger Circuit in Trenton, which included first-run and subsequent-run theatres. As chief executive since 1939 of the Allied Independent Theatre Owners of Pennsylvania, he has done the buying and booking for theatres throughout the entire Philadelphia Exchange territory, including theatres in Lewistown, Scranton, York, Lansdale, and Philadelphia. He also has organized and headed trade associations and testified before Congressional committees on motion picture matters. He has managed theatres, supervised their operation, laid out the show, written the advertising, seen that theatres were properly maintained and repaired, and handled all the details of attracting the public to theatres.

Samuelson also qualified as an expert and his expert testimony was admitted in evidence in antitrust cases involving

motion picture theatres in Denver and Buffalo. Loew's, Inc., v. Cinema Amusements, Inc., 10 Cir., 1954, 210 F.2d 86; Bordonaro Bros. Theatres, Inc., v. Paramount Pictures, Inc., 2 Cir., 1949, 176 F.2d 594.

Mr. Samuelson on cross-examination displayed a thorough knowledge of all theatres in eastern Pennsylvania and was able to give a precise geographic definition of the Philadelphia Exchange area. He became familiar with the Norris and Grand theatres in Norristown in the early 1940's when he assumed the leadership of the independent exhibitors in this area. He showed a familiarity with the Norristown area through which he had passed frequently on his way to theatres in other places for which he bought and booked pictures.

Samuelson first stated what in his opinion the patronage area of the Norristown theatres was from 1939 to 1951, the damage period in suit. This area had a total population of 97,000, which he reduced to 90,000 in his computation in order to leave a margin for error. He then divided the period in suit into four sub-periods on the basis of his experience in the motion picture business. Next he estimated the varying percentages of the Norristown patronage area population who would have patronized all 15 motion picture theatres weekly in the area during the four sub-periods:

(1) 1939–1941:   45% or 40,000
(2) 1942–1945:   55% or 50,000
(3) 1946–1948:   55% or 50,000
(4) 1949–1951:   45% or 40,000

After estimating the average weekly number of patrons who would have gone to all 15 theatres in the area, Samuelson estimated what portion of these patrons would have patronized the Norris and Grand during each sub-period, assuming that these theatres had had territorial release. He allocated 35% of the estimated total patrons in the area to the Norris for the first three sub-periods and 30% for the last sub-period. He allocated about half those percentages to the Grand Theatre.

Samuelson estimated an admission price (not including taxes) for both theatres of forty-five cents from 1939 to 1941 and fifty cents from 1942 to 1951 as a "fair admission price for a first-run theatre in Norristown during that period of time." He then multiplied the estimated number of admissions by the estimated admissions prices and obtained what he said the two theatres would have grossed during each of the four sub-periods into which he divided 1939 to 1951.

His estimated total gross admissions receipts for the 13-year damage period was $5,103,800 for the Norris and $2,688,000 for the Grand on an assumed territorial release (or first-run). He took the Norris' estimated gross of $5,103,800 and subtracted film rental which he estimated at 45% of gross or $2,296,710, which left an estimated balance of $2,807,090. From this estimated balance he subtracted the actual balance of $1,510,818 (introduced in evidence by plaintiffs' auditor) which represents the difference between the Norris' actual gross of $2,439,303 and the actual film rental of $928,453. From the estimated balance he also deducted the sum of $130,000 for estimated additional advertising, $60,840 for estimated additional costs for ushers and house help, and $40,000 for estimated additional incidental expenses for an assumed first-run operation. After making all these deductions from the estimated balance, Samuelson arrived at a figure of $1,065,541.96, which represents his estimate of the Norris' loss of profits for the 13 year period.

Using the same method, he calculated that the Grand's loss of profits was $399,533.45 for the period in suit as a result of being deprived by defendants of territorial release.

Defendants contend that Samuelson's testimony exceeded the permissible limits of opinion evidence, in that neither he nor plaintiffs supplied sufficient facts on which to predicate an opinion. Defendants rely on Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct.

574, 90 L.Ed. 652, as support for their contention that plaintiffs were required to use one of two methods of proving damages: (1) By a comparison of earnings of plaintiffs' theatre with those of a comparable theatre during the period involved; or (2) by a comparison of the earnings of plaintiffs' theatre during that period with a "normal" period immediately preceding the alleged deprivation of run.

■ The Supreme Court, however, in approving these two methods of proving damages did not rule out other methods of proof, where the two approved methods are not feasible. In the present case, unlike the situation in the Bigelow case, since the Norristown theatres had never been free of clearance in favor of downtown Philadelphia, there was no prior "normal" period with which plaintiffs could compare the Norris' and Grand's profits during the period in suit. And, unlike the situation in Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561, there was no comparable competitive theatre in Norristown operating on a prior run (territorial release), the profits of which plaintiff could have compared with those of the Norris and Grand during the damage period. Furthermore, since plaintiffs' case is predicated on the theory that the Norris and Grand are located in a separate patronage area independent from and not in substantial competition with the downtown Philadelphia patronage area, it is apparent that a comparison between the profits of the Norristown theatres and the first-run downtown Philadelphia theatres (such as the physically similar Boyd theatre) would probably not have constituted a satisfactory method of proving damages in the present action.

■ Defendants contend that Samuelson's estimates of the following elements of his computation were not based on facts of record, were therefore speculative, and should not have been admitted in evidence: the Norristown patronage area; the sub-division of the damage period; the total average weekly patronage in the area during each sub-period; the percentage of estimated total movie patronage allocated to the Norris and Grand; the estimated admission price; the estimated rental and additional expense for advertising, ushers, and incidentals. These were problems for an expert. Because of Samuelson's qualifications he was properly permitted to testify as to them. Therefore, all of defendants' arguments in reference to these elements go to the weight rather than to the admissibility of Samuelson's testimony.

The language used by the Court of Appeals for the Second Circuit in William H. Rankin Co. v. Associated Bill Posters of U. S., etc., 42 F.2d 152, 155, is particularly appropriate here:

"* * * The fact that this amount of the plaintiff's damages could not be expressed in exact figures did not make them speculative. There was no speculation as to the fact of actual damage. Its business had been seriously curtailed. The defendants had caused the damage, and cannot be permitted to escape liability because it is difficult for the plaintiff to express in terms of dollars the damages it has suffered. This evidence, while purely an estimate and introduced as such, was proof of a kind as definite and certain as the subject-matter admitted. It had to do with what was never actually earned because of the defendants' wrongdoing. The witness testified from his knowledge of the business history [in the present case, knowledge of the business of exhibiting motion pictures], made his calculations upon what appears to be a reasonable basis, and the defendants had ample opportunity by cross-examination or the offer of their own evidence on the subject to discredit him and show any fallacy in his reasoning or testimony. Whatever may be said of its weight,

and that was entirely for the jury, we have no difficulty with its admissibility. Eastman Kodak Co. v. Southern Photo Materials Co., supra, 273 U.S. [359] at page 379, 47 S.Ct. 400 [71 L.Ed. 684]. * * * "

Samuelson withstood a rigorous cross-examination and defendants offered no expert testimony to contradict his computations. One of defendants' witnesses, Mr. Schlanger, testified that to estimate what the grosses would have been for the Norris and Grand on an assumed territorial release he would have chosen a comparable town such as Easton, Pennsylvania, which was pretty close in population to Norristown and had a territorial release (first-run). The defendants obviously had available the performance figures for the theatres in Easton to which they license their pictures, but they did not produce them or make this comparison.

Defendants did produce an expert witness, Mr. Toewe, a certified public accountant, who had made an examination of plaintiffs' financial records and computed a breakdown of profit and loss at the Norris and Grand theatres for each of the years from 1939 to 1951. He introduced several charts, one of which purported to show the percentage of profit earned on gross income of the industry as a whole (based on Government statistics) as compared with that of the Norris and Grand. By that comparison he attempted to show that the proportion of profits retained by the Norristown theatres was abnormally high as compared with the national figures.

█ Plaintiffs correctly point out that the jury, in arriving at a verdict ($425,000) which was much less than Samuelson's estimate of damages ($1,-454,965.41), might have concluded from Mr. Toewe's figures that during certain very profitable years the Norris and Grand theatres grossed about as much as they could have even with a better run, and that the jury might have awarded damages only for the less profitable years. Plaintiffs also point out that the jury might have concluded that, on the basis of the purported ratio of the Norris and Grand earnings to national figures, Mr. Samuelson's figures should be adjusted proportionately. The jury's function in determining the amount of damages was to weigh all the factors, estimates, and figures introduced by both plaintiffs and defendants.

It should also be noted that similar expert testimony by Samuelson was sustained by the Court of Appeals for the Second Circuit in Bordonaro Bros. Theatres, Inc., v. Paramount Pictures, Inc., 1949, 176 F.2d 594.[2] In that case the complaint alleged that due to an illegal conspiracy by the defendants the plaintiff was unable to obtain an adequate supply of motion picture films for first-run exhibition at its Palace Theatre in Olean, New York. Although Samuelson's qualifications as an expert were vigorously contested, the Court admitted his opinion testimony in evidence and the verdict, which may have been based at least in part on his testimony, was upheld by the Court of Appeals. In the Bordonaro case Samuelson first classified all of the pictures released by the distributor defendants over the period in suit as "A", "B", and "C" pictures on the basis of his experience and knowledge of the industry. He then estimated that during this period 55 to 60% of the "A" and "B" pictures should have been played at plaintiff's theatre, the Palace, with the remainder playing at defendant Warner Bros. Circuit Management Corporation's competing first-run theatre, the Haven. Samuelson estimated that, with that percentage of the better pictures, the Palace would have grossed daily the sum of $500

2. Because of the importance of the question of the use of expert testimony in the proof of damages in a case of this type, I have obtained and studied the briefs and appendices filed with the Court of Appeals for the Second Circuit in the Bordonaro case.

(rather than the $285 actually grossed), resulting in an additional profit for the six years in suit of $300,000. The trial court held this to be admissible testimony.

The trial court charged the jury in the Bordonaro case that in estimating damages it could consider two theories submitted by plaintiff. The first theory was predicated on Samuelson's estimate described above. The second theory was predicated upon a comparison between the actual gross receipts of the Palace and of the Haven theatres and showed a loss of profit by plaintiff of $81,000. This evidence also had been introduced by plaintiff.

The jury brought in a verdict of $28,500 against only two of the seven distributor-defendants, Paramount and RKO, and against exhibitor-defendant Warner Bros. Circuit Management Corporation. The trial court set aside the verdict as to RKO.

On appeal defendants argued that Samuelson's expert testimony was incompetent and prejudicial to the defendants. The Court of Appeals for the Second Circuit overruled this contention, saying, 176 F.2d at page 597:

"Damages in such a situation [where plaintiff's theatre was subject to clearance in favor of a competitive, comparable Warner theatre as a result of an illegal conspiracy] cannot be assessed with mathematical precision; but the testimony of plaintiff's expert witness, Samuelson 'while purely an estimate and introduced as such, was proof of a kind as definite and certain as the subject-matter admitted.' William H. Rankin Co. v. Associated Bill Posters of U. S. and Canada, 2 Cir., 42 F.2d 152, 155,

certiorari denied Associated Bill Posters of U. S. and Canada v. William H. Rankin Co., 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765. Defendants must not be allowed to create their own immunity by the extent and duration of their conspiracy."

Accordingly, I conclude that Samuelson's estimates on damages in the present case were competent evidence and that defendants' arguments with respect to his testimony are jury arguments having to do solely with its weight and not with its admissibility.

The defendants urge as a ground for the granting of a new trial that the jury was exposed to extraneous and prejudicial matters by the misconduct of third persons and jurors. Eight days after the verdict had been taken and the jury discharged, the defendants filed a motion to recall the jury for interrogation, supporting the motion by an affidavit of three of defendants' counsel. The gist of the affidavit is that juror number 12, Mr. McCartin, had information about the Goldman case before the trial and "followed it up on the outside" during the trial and communicated this information to other jurors during the trial.[3] Defendants also filed an affidavit of juror number 13, the alternate juror, to the effect that McCartin discussed the Goldman litigation with him during the trial and before the jury went out and that McCartin told him that Goldman had recovered a million dollars. (Goldman in fact recovered treble damages in the amount of $375,000.)

The Court denied the defendants' motion to recall the jury without prejudice to the rights, if any, of either side to obtain information from individual jurors by means of affidavits or otherwise. The defendants then moved for leave to take the depositions of the

---

3. The affidavit also goes into the deliberations in the jury room and asserts that one of the jurors was prejudiced against corporations and another juror did not hear the reading of an answer sent by the Court to a question from the jury. The statements in the affidavit were the result of an ex parte post-trial interrogation of the jurors, conducted by some of defendants' counsel, without notice of plaintiffs' counsel and without leave of Court.

jurors and the Court permitted them to take the deposition only of juror number 12, Mr. McCartin, because he was the only juror who was alleged to have been directly subject to extraneous influence.

The examination of Mr. McCartin under oath took place before the Trial Judge three weeks after the trial. Mr. McCartin, contradicting the affidavits of defendants in several particulars, testified in substance as follows: After the verdict of the jury, defendants' counsel solicited information from him about the deliberations of the jury, which he gave to them after they assured him that it was proper for him to do so. He spoke to nobody about the case during the trial, aside from other members of the jury, and nobody approached him about it or spoke to him about it during the trial. He knew about the Goldman case from reading the newspapers some years ago and he obtained no information about the Goldman case during the trial and did not seek any. He testified that if the defendants' counsel had asked him about the Goldman case when the jury was being selected he would have told them what he knew. After the trial a number of his neighbors discussed the case with him, including a young lady employed by a company connected with the motion picture business. No such discussion occurred during the trial. Finally, he testified that when the defendants called Mr. Goldman as a witness in their own case he was reminded of what he had read about the Goldman case some years ago.

▆▆ This testimony shows that Mr. McCartin was not subject to any extraneous influence during the trial. I was favorably impressed with his credibility and frankness on the basis of his conduct and demeanor while testifying. The examination of Mr. McCartin demonstrated that he took his oath as a juror seriously and observed it strictly.

▆▆ Under the principles of McDonald v. Pless, 1915, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 and United States ex rel. Darcy v. Handy, 3 Cir., 1953, 203 F.2d 407, the deliberations of the jurors themselves must remain secret and the only ground for a new trial would be a showing of some prejudicial extraneous influence on the jury. None was shown in the present case. In their argument defendants rely heavily on the case of Paramount Film Distributing Corporation v. Applebaum, 5 Cir., 1954, 217 F.2d 101, where the court ordered a new trial on the ground that strong evidence of tampering with the jury was uncovered when the trial judge recalled the jury for interrogation after the trial. No jury tampering was shown in the present case.

▆▆ The rule governing the problem of questioning jurors after a verdict has been well stated by the Supreme Court of the United States in Stein v. New York, 1953, 346 U.S. 156, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522:

"Nor have the courts favored any public or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them. * * * 'If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.' McDonald v. Pless, supra * * *."

▆▆ I conclude therefore that, under the circumstances outlined above, recalling the jury for interrogation would have been improper and that the evidence obtained from the interrogation of juror McCartin demonstrated that defendants' charges that the jury was subjected to extraneous prejudicial influences were without substantial basis.

Defendants requested the Court to explain in its charge that if there would be a verdict for plaintiffs the Court would treble it. The Court refused to do this and also refused to permit de-

fendants' counsel to explain this matter to the jury. Defendants contend these refusals were error on the ground that the jury's lack of knowledge that their verdict would be trebled might have caused them to render a verdict for more than the actual amount of damage in order to impose a penalty on defendants for violation of the antitrust laws.

This contention was well answered in a recent opinion by Judge Holtzoff of the United States District Court for the District of Columbia in Webster Motor Car Co. v. Packard Motor Car Co., 135 F.Supp. 4, 11:

"There was no reason for informing the jury that whatever damages they would award would be trebled, because this is a matter solely for the court. In fact, the jury might have taken such a statement as an intimation to keep the damages at a low level, in view of the fact that the amount allowed by the jury would be multiplied by three. This would have tended to defeat the purpose of the Act of Congress.

"In this connection, it must be noted that it is the practice in this jurisdiction [and also in the Eastern District of Pennsylvania] in civil cases not to give the pleadings to the jury. * * * There may be some reason for imparting the information to the jury in those districts in which it is customary to supply the pleadings to the jury in civil cases, because otherwise the jury on reading the prayer for relief might be confused by the demand for triple damages and might be perplexed by a doubt whether it was its duty to multiply the actual damages by three." ·

This Court adopts the conclusion and reasoning in the above quotation from Judge Holtzoff.

Defendants also contend it was prejudicial error for the Court not to advise defendants as to which of their points would be included in the charge. At the conclusion of the testimony, counsel for defendants requested, in accordance with Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.,[4] the Court advise them prior to the summation which of their requested instructions would be included in the charge. The Court advised counsel for both sides that all their requests were denied. However, in the charge itself the substance of many of defendants' requests were submitted to the jury by the Court, and some of them were submitted in the identical form requested by defendants. Defendants charge that the Court's action constituted a lack of compliance with Rule 51 and was prejudicial to the defendants, in that by not having the advice which Rule 51 intended that they should have it was most difficult for defendants' counsel to point up for the benefit of the jury many portions of their summations.

This question was discussed in Levin v. Joseph E. Seagram & Sons, Inc., 7 Cir., 158 F.2d 55, by Justice, then Circuit Judge, Minton. In the lower court the trial judge, referring to defendant's counsel's requests for instructions, replied: "I am adopting most of them, in substance. I am not giving any instructions that are argumentative."

Justice Minton stated, 158 F.2d at pages 57–58:

"Counsel for the defendant seemed to be satisfied. At least, he made no request for time to read the instructions [i. e., the charge] before argument, nor for a recess to thus enable him to read them.

"The court should not act arbitrarily when request is made by counsel as to the action of the court on the instructions requested and the giving of instructions generally. If counsel requests information as to the instructions and is not satisfied with the response of the court,

4. Rule 51 provides in pertinent part: "The court shall inform counsel of its proposed action upon the requests prior to their arguments * * *"

before he can claim prejudice thereby he will have to do more than acquiesce in the court's response which he thinks unsatisfactory. Dallas Ry. & Terminal Co. v. Sullivan, 5 Cir., 108 F.2d 581, 583. He must request to see and read the instructions [i. e., the charge], and if that is denied he will then be in a position to show that he was prejudiced, if in fact he was. Certainly the defendant has not shown that the court's action in this case was prejudicial. Mere dissatisfaction with the court's response to a request for information as to the instructions the court would give in and of itself does not show that the court's action was prejudicial to the defendant."

In the present case defendants' counsel made no request to see and read the Court's charge before they made their summations to the jury. Therefore, for the same reasons stated in the Levin case, they are in no position to claim and show prejudice resulting from the Court's general denial of all their points. Furthermore, defendants' summations show that they knew well what all the issues in the case were and that they argued all the issues at great length. No prejudice to them has been shown.

Defendants' numerous other contentions in support of its motions for judgment n. o. v. and for a new trial are also overruled, including its contentions that the conduct of plaintiffs' counsel deprived defendants of a fair trial and that there was no proof that the clearances in question resulted from a conspiracy or were unreasonable. In regard to the latter contention, there was sufficient independent proof, aside from the *prima facie* evidence of the Paramount decrees, to sustain a finding by the jury that the clearances resulted from a conspiracy in unreasonable restraint of trade.

Defendants' motions for judgment notwithstanding the verdict and for a new trial will be denied.