**L. G. SEMKE, d/b/a Semke Auto Mart, Plaintiff-Appellant,**

**v.**

**ENID AUTOMOBILE DEALERS ASSOCIATION et al., Defendants-Appellees.**

**No. 71–1224.**

United States Court of Appeals, Tenth Circuit.

March 13, 1972.

Rehearing Denied April 14, 1972.

See also, D.C., 52 F.R.D. 518.

Harry L. Hobson, of Jochems, Sargent & Blaes, and Donald E. Lambdin, of Blair, Matlack, Rogg, Foote & Lambdin, Wichita, Kan. (William J. Otjen, Jr., Enid, Okl., on the brief), for plaintiff-appellant.

Lynn J. Bullis, Jr., of Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl. (Earl B. Mitchell, Jr., of Mitchell, Mitchell, DeClerck & Cox,

Enid, Okl., on the brief), for Enid Automobile Dealers Association, Day Ford Company and Gene Kurz.

C. Harold Thweatt, of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl. (Val R. Miller, of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., on the brief) for Ford Motor Company.

Otjen & Carter, Enid, Okl., for Dierksen-Jones Buick Co., Inc., Dean Pearson Dodge, Inc., Sam Norton, Jr., and Stanley B. Stuart, d/b/a Norton-Stuart Pontiac-Cadillac of Enid, Fred L. Jones and Dean B. Pearson.

Harold J. Singer, of Mitchell, Singer & Johnston, Enid, Okl., for Fidelity Motors, a Partnership, Jane E. Champlin, Executrix of the Will and Estate of Joe N. Champlin, Deceased, and Clarence W. Durheim; Musser & Green, Enid, Okl., for Northcutt Chevrolet Co., Inc., Janzen Olds, Inc., Clarence J. Janzen and Leonard C. Northcutt.

Robert L. Gregory, Enid, Okl., for Hurst Motor Co. and Jimmy B. Hurst, Sr.

Lloyd W. McKnight, of McKnight, Gasaway & McKnight, Enid, Okl., for The Enid Radiophone Co., The Enid Publishing Company, Joseph F. Hardy, Milton B. Garber, John W. Taylor and Pat Murphy.

Before SETH and DOYLE, Circuit Judges, and MECHEM, District Judge.

## WILLIAM E. DOYLE, Circuit Judge.

The within action was instituted pursuant to the entire range of the Sherman and Clayton Act provisions, 15 U. S.C. §§ 1–27. However, the theory pursued at trial was limited to § 1 of the Sherman Act, the contention of the plaintiff being that the defendants were guilty of a combination and conspiracy in restraint of trade.

The defendants-appellees are franchised *new* car dealers who operate in the same area, Enid, Oklahoma, as does the plaintiff. The latter is a licensed *used* car dealer; he does not have a franchise from any manufacturer authorizing him to sell new or unused cars. There is substantial evidence to show that the defendants sought by various means to injure the plaintiff in his efforts to furnish new cars to buyers, an activity which he describes as a car buying service involving the obtaining of particular types of cars on order by customers. Ordinarily, plaintiff attempted to have these vehicles transferred directly from the dealers from whom obtained (most of whom were located outside Enid) to the purchaser. The jury returned a verdict in the amount of $1,-500.00 plus attorneys' fees in the amount of $3,000.00. The $1,500.00 amount was trebled, but this $4,500.00 was offset by a pretrial settlement in the amount of $5,000.00 with two of the alleged co-conspirators, the Public Broadcasting Company, Inc. and its President.

### I.

Various questions are before us on appeal, but the central issues involve, first, concerted activities of the defendants petitioning state officials to enjoin plaintiff pursuant to an Oklahoma Statute, 47 O.S. §§ 561–575, which regulates the distribution and sale of new or unused motor vehicles within the state. Section 564 of this statute requires the obtaining of a license in order to be a new car motor vehicle dealer or salesman. There are criminal and civil sanctions for its violation; our concern here is § 567 which provides that the Oklahoma Motor Vehicle Commission created by the law may bring injunctive action to enforce the provisions of the Act.

The defendants unquestionably acted in concert to persuade the Commission to file an injunction suit in the Oklahoma State Court. The permanent injunction which was obtained was ultimately affirmed by the Supreme Court of Oklahoma.

Plaintiff maintains that the concerted activity of the defendants in inducing the State to impose sanctions against the plaintiff produced economic injury

for which he is entitled to compensation. The trial court disagreed.

A related issue pertains to concerted efforts on the part of the defendants to injure the plaintiff in his business by activities other than petitioning the Commission or going to court and, particularly, whether he can recover for injuries inflicted as a result of such conspiracy or conspiracies prior to his having been enjoined by the Oklahoma State Court from dealing in new or unused cars. The trial court held that the presence of the statute in and of itself precluded recovery quite apart from its terms having been invoked by the defendants.[1] The jury was told that plaintiff could not recover for alleged damages arising from loss of sales of new or unused vehicles either before the injunction or after it was entered.[2]

Review of other rulings of the trial is requested.

A. The court determined that the Ford Motor Company was entitled to summary judgment.

B. The court informed the jury that any verdict returned by and in favor of the plaintiff would be trebled by the court.

C. The court, 320 F.Supp. 445, held that the $5,000.00 settlement was subject to being offset against any sum re-

covered by plaintiff, notwithstanding that the offset was not pleaded.

D. The award of $3,000.00 in attorneys' fees is said to be inadequate.

II.

The plaintiff has been in the automobile selling business in Enid, Oklahoma for approximately 25 years. As noted, he has a used car dealers license and at one time (in 1959) had a new car dealers license, for he then had a Rambler franchise; in 1963 this dealership was terminated and since that time he has not had a new car dealers license. In 1964 he started to do business as his so-called car buying service. His contention is that he acts as an agent for individuals wishing to purchase automobiles and searches through dealerships in areas removed from Enid until he locates an automobile which satisfies the specifications of the customer. He purchases the car, preferably in the name of the ultimate customer, but sometimes in his own name, following which he transfers the vehicle to the customer. This service undoubtedly results in savings to the customer. He is compensated in the form of money or a used car trade-in by the customer for the service rendered. Defendants take the position that he is plainly engaged as a new car

1. Now, I am finding, as a matter of law, that this purchasing agent, buying service bit, violates the law which I clearly believe it does. I think it violates the injunction as well and what is done is an undisputed matter of fact and I think the Oklahoma law would be and this has not been ruled on by the Oklahoma Courts directly, would be to this effect, that there is no authoritative decision.

I have to decide what I think the law would be and I think that this type of activity is prohibited by the Motor Vehicle Act. (pp. 2207–2209 Record).

2. However, the jury in considering any loss of profits sustained by Plaintiff may not award damages for any profits Plaintiff may have lost from the sale of new or unused cars during the period involved. This is because loss of profits may not be considered as an element of damages

where the business from which they would have resulted was or would have been conducted in violation of the law. In this connection, Oklahoma law provides that one must have a state license in order to sell new or unused cars as a dealer or salesman. The evidence is undisputed that Plaintiff had no such license during the period involved in this case, thus, could not lawfully sell or realize profits from the sale of new or unused cars. The jury is further instructed as a matter of law that any efforts by Plaintiff to sell new or unused cars as a purchasing agent or buying service for others would be unlawful under Oklahoma law without the required state license and any loss of profits by selling new or unused cars by this method may not be considered by the jury in awarding damages. (Record, pp. 2369–2370).

dealer operating without either a dealers or salesmans license.

Plaintiff contends that the primary conspirators are the members of the Enid Automobile Dealers Association, which organization persuaded the executive director of the Oklahoma State Motor Vehicle Commission to bring an injunction suit restraining plaintiff from selling new cars without a license. The injunction was entered on December 18, 1967. The judgment was affirmed by the Oklahoma Supreme Court on January 27, 1970.

In addition to the program of the defendants to get relief under Oklahoma law, there was evidence showing that the defendants induced local news media to refuse to accept advertising from the plaintiff and that such advertising was refused as a result of these efforts by the Enid Publishing Company and radio stations. Other activities relied on by the defendants included refusal to provide warranty service on automobiles which had been purchased through the plaintiff and a refusal to sell parts to plaintiff so that the vehicles sold could be serviced.

■ As noted before, the trial court ruled and instructed the jury that the State of Oklahoma had a right to regulate the automobile business in the manner provided in the statute in question. The court also instructed the jury that since a private citizen may seek the enforcement of state laws through proper channels, concerted activity on the part of a group of this nature is not in violation of the Sherman Act. The court did instruct the jury that while a newspaper could refuse advertising, there was an exception which prohibited such refusal or rejection as a part of a combination and conspiracy contrary to the antitrust laws of the United States, in which case the newspaper or radio station could be found to have violated the antitrust laws. The court also held and further instructed the jury that the defendants could refuse to deal with anyone and, further, that a dealer could charge any amounts it wished if it performed services.[3]

In charging the jury as to allowable damages, the court's instruction that plaintiff was precluded from recovering damages during the period that he did not have a license and also based on the action of the defendants in obtaining an injunction in the District Court of Garfield County, Oklahoma, effectively ruled out virtually every source of damage and here, as we view it, the jury verdict was simply a nominal award which was not based on any substantial demonstrated loss.

### III.

### INVOKING STATE PROCESS

■ The trial court was correct in holding that the defendants in invoking state action acted validly and in accordance with the ruling of the Supreme Court in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and in accordance also with the later Supreme Court decisions in Eastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and California Motor Transport Company v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

In *Parker* a California statute authorized the establishing through action of state officials of programs for the marketing of agricultural commodities produced in the state in such a way as to restrict competition among the growers and to maintain prices in the distribution of their commodities to packers. This Act authorized the formation of marketing combinations composed of a number of producers within a particular

---

3. The court did not charge the jury that the refusal to deal is a violation of the antitrust laws if it is accompanied by a purpose to fix prices or restrain trade. This is, of course, fundamental.

district. This was a marketing stabilization program. In an action against the state officials administering the Act the Supreme Court held that the Sherman Act did not preempt this field of economic opportunity and preclude the state from acting in order to solve its own economic problem. The Court said that this was a program which the Congress approved and sought to encourage. It was emphasized that although the combination involved was among private individuals, it was unquestionably formed under the authority of state law and for the purpose of advancing a state economic program, and consequently it was indeed state action. This was not an antitrust suit. Nevertheless, the Supreme Court held that the Sherman Act did not operate to void the program and the underlying statutory authority for it.

In *Noerr* and *Pennington*, as in the case at bar, there was concerted effort to obtain the passage or enforcement of laws all motivated by efforts to restrain trade. Nevertheless, it was held that so long as the efforts made to influence public officials are bona fide and are carried out by proper means, the conduct is in effect exempt from the antitrust laws even though the persons petitioning the governmental agencies or utilizing the courts are seeking to realize anticompetitive objectives and are thus fully aware that their competitors are likely to suffer direct damage as the result of this use of government machinery. See 365 U.S. at 143, 81 S.Ct. 523. The sole exception recognized was a sham use of the state process.

This concept was again approved in *Pennington, supra.* Here small coal mine operators brought an action against the United Mine Workers and employers complaining about a combination of large operators and the Union to establish wage scales which exceeded the financial abilities of the plaintiffs to compete. The Supreme Court ruled that approaches of the unions and the coal operators to the Secretary of Labor and to the TVA officials were not within the prohibition of the antitrust laws even though the conduct was carried out with intent to further a conspiracy in restraint of trade. The court said:

> \* \* \* Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. The jury should have been so instructed and, given the obviously telling nature of this evidence, we cannot hold this lapse to be mere harmless error. 85 S.Ct. at 1593.

■ *Trucking Unlimited*, recently decided by the Supreme Court, gave full effect to *Noerr* and *Pennington*, but remanded the case for trial on the issue whether the resort to the California regulatory agency was a mere sham within the meaning of *Noerr*. It was held that the allegations of the complaint describing efforts on the part of the defendants to preempt the administrative process and to exclude the plaintiffs from it for the purpose of monopolizing the granting of authority (certificates of convenience of necessity) could establish a misuse of state procedure. The Court cited some instances which fall within the exception, such as the monopoly which results from the obtaining of a patent by fraudulent means or conspiracy within a licensing authority to eliminate a competitor or bribery of a public purchasing agent. Thus, the term "sham" in this context would appear to mean misuse or corruption of the legal process. Therefore, the utilization of the court or administrative agency in a manner which is in accordance with the spirit of the law continues to be exempt from the antitrust laws.

Thus, this recent decision in *Trucking Unlimited* furnishes insight as to what is meant by the term "sham", but in so doing it does not aid the plaintiff at bar because it has not been shown here that defendants were guilty of fraud, corrup-

tion or misuse of the state processes. This ruling of the trial court must therefore be affirmed.

## IV.

## THE OKLAHOMA LICENSING STATUTE AS A PER SE OBSTRUCTION TO AN ANTITRUST SUIT

Does the state exemption expounded in the *Parker-Noerr* line of cases extend to conspiracies which do not look to petitioning state officials or which do not directly involve state action? Thus, in this context, the question arises, does a licensing statute such as we have here allow an antitrust defendant to assert as a defense the plaintiff's non-compliance with the licensing requirement? The mentioned line of decisions of the Supreme Court contains no hint or suggestion that the exemption created should be available as a defense. These cases involved direct state action and the citizen's right to use the state administrative and judicial processes, and the tenor of the decisions is that this state action antitrust exemption should be restricted rather than expanded.[4]

The Oklahoma statute, 47 O.S. §§ 561–575, is a regulatory measure designed to insure the responsibility, financially and otherwise, of motor vehicle dealers. It defines a dealer as one who solicits or advertises the sale of new or unused motor vehicles and who, in addition, holds a franchise with a manufacturer or distributor of a particular make or motor vehicle. A salesman is defined as a person who for gain or compensation regularly or occasionally transfers new or unused motor vehicles for any motor vehicle dealer to any third person. A new or unused motor vehicle is, generally speaking, a vehicle in the possession of the manufacturer or franchise holder and on which the original title has not issued from the franchised dealer.

Throughout this litigation Semke argued that he was not a dealer or salesman inasmuch as he did not have a franchise and did not work for a dealer or "sell" new or unused motor vehicles.[5] The Act makes it a misdemeanor to engage in business as or to act as a motor vehicle dealer without first obtaining a license. It is the Commission which is the licensing agency, and it has investigative powers in connection with this. Section 567, as previously indicated, authorizes the Commission to bring injunctive actions for the purpose of enforcing the provisions of the Act.

■ Undoubtedly this statute is designed to furnish protection to the public by requiring automobile dealers to meet a standard of conduct. The statute has a definite public purpose in that it seeks to prevent unscrupulous persons from becoming dealers or salesmen of automobiles. It is also undeniable from a reading of the entire statute that it has a private or special purpose as well, that of restricting trade in automobiles within the framework of the manufacturers franchise system.[6] The character

4. See Donnem, "Federal Antitrust Law Versus Anticompetitive State Regulation," 39 A.B.A. Antitrust Law Journal 950 (1970). The author suggests that official activity is requisite to the state action immunity doctrine.

See also Note, "State Action Exemption from the Antitrust Laws," 50 B.U. Law Rev. 393 (Summer 1970). This author also suggests that the state has to be directly and substantively involved in order for the exemption to apply.

See Comment, "Antitrust Immunity: Recent exceptions to the Noerr-Pennington Defense," 12 Boston College Ind. & Comm. Law Rev. 1133 (1971).

5. The argument that he did not actually sell new cars was considered by the trial court to be transparent. We do not disagree with this.

6. We mention this only in passing and not as a criticism or ruling on validity of the statute, but, rather, to point up the general nature of this state legislation.

One of the stated purposes of the Oklahoma statute (47 O.S. § 561) is "to foster and keep alive vigorous and healthy competition by prohibiting unfair practices by which fair and honest competition is destroyed and prevented," but the purpose is further declared to be "to protect the public against the creation or perpet-

of this statute has some relevancy in weighing its policies and objections in relationship to the federal antitrust laws and also in determining whether a litigable question existed as to whether the plaintiff was covered by it whereby he was justified in his asserted belief that he was not subject to the Act. There exists some likelihood that the statute was designed to prohibit plaintiff's particular activity, and yet through all of the period of his activities no effort was ever made to prosecute him under the criminal part of the Act and, indeed, the injunctive sanction was employed only after he had operated for a number of years. Thus, there was basis for plaintiff to question whether the statute applied to his activities, and until such time as the judgment in State Court was obtained there existed a question generally as to whether the statute was capable of functioning as a bar to antitrust litigation (assuming that a statute can of itself serve this purpose). Therefore, even if the mere presence of a licensing statute such as this serves to preempt the operation of the antitrust laws and serves to, in effect, exempt persons even though they are not acting pursuant to law from a private antitrust suit, nevertheless, *this* statute is not so clear in its terms that it could function in this manner. To hold that the state itself blocks out a suit under the antitrust laws involving alleged conspiracies unrelated to enforcement of this licensing statute introduces a species of *in pari delicto* or contributory illegality as a defense to the plaintiff's complaint and, as noted, this is quite different from the exemption which arises from the activating of state officers or state process. In this situation state *action* as it was recognized in *Parker, Noerr, Pennington* and *Trucking Unlimited,* is not here involved for we are now concerned with the plaintiff's conduct and the inquiry whether *he* is *barred* and not whether the defendants are clothed with privilege or exemption resulting from state *action.*

The doctrine of *in pari delicto,* or, as it is sometimes called, contributory illegality, enjoyed limited following in the distant past and has even less approval at present. Harper and James, The Law of Torts § 17.6, pages 995–996. The authors state that this doctrine has very occasionally found favor among American courts. The authors go on to say:

> There is another point of view which has very occasionally found favor among American courts. The violator of penal statutes is after all a "criminal." He might therefore be treated as something of an outlaw who is liable for all the direct results of his misdeeds and disentitled to seek redress through the courts for any injury to which his criminal conduct contributed. Thus a defendant has been held liable without regard to negligence for injury to another person hit by a blow aimed at a horse he was maltreating contrary to statute. A similar result has been reached by one court where defendant was violating a statute which forbade hunting on Sunday. And Massachusetts treats an unregistered motor vehicle as a trespasser on the highway. What little currency this notion enjoys today, however, is largely confined to cases where a lawbreaking *plaintiff* is denied access to the courts, a fact which makes it run sharply counter to the objective of compensating accident victims. The doctrine appears to be a barbarous relic of the worst there was in puritanism. Its application could be justified at all only as a stringent means of imposing additional sanctions to enforce a very important provision of the criminal law, and it is questionable indeed whether it is wise for the courts to assume the responsibility of imposing such a sanction

uation of monopolies and practices detrimental to the public welfare." It defies logic to allow a conspiracy in restraint of trade to be immunized by allowing the conspirators to use the licensing provision of this regulatory system as a protective shield in a private action charging a conspiracy in restraint of trade.

when the legislature has not seen fit to do so. It should be noted in passing that the limitations of the "statutory purpose" notion (described in the last section) have no logical relevance to the doctrine described in the present paragraph.

The authors cite a number of case examples showing the illogic of barring a plaintiff from prosecuting an otherwise valid suit on the ground that the plaintiff is after the fact held to have been acting contrary to a statute which may or may not be related to his activity.[7]

█ The Supreme Court has many times disapproved of the *in pari delicto* doctrine in antitrust cases and, its most recent pronouncement in Perma Life Mufflers, Inc. et al. v. International Parts Corp. et al., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), rules it out in cases in which the plaintiff was charged with participating in the unlawful scheme.

In *Perma Life* the plaintiffs had participated in an unlawful conspiracy to the extent of utilizing illegal arrangements which had been formulated and carried out by others, and it was this participation as dealers in the illegal scheme which was urged as a bar to their bringing actions against the active participants. The dealers were under the arrangement restricted in various ways and this was the basis for the action. The Court, however, held that the fact that they had benefitted from these restrictive arrangements did not prevent their suing under the antitrust laws. The Court said:

\* \* \* We therefore hold that the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action. 392 U.S. at 140, 88 S.Ct. at 1985.

The Court did not say whether complete involvement in a monopolistic scheme could ever be a basis for barring an action, but noted that there was nothing in the language of the antitrust acts showing intent on the part of Congress to make the common law doctrine of *in pari delicto* or for that matter any other broad common law doctrine a defense to a private suit which serves public purposes.[8] The underlying basis for the *Perma Life* decision is the superior public interest in enforcing even by private action the antitrust laws. As the Court put it, the weighing of the relative moral worth of the parties would seriously undermine the value of the private action in antitrust enforcement.[9] If par-

---

7. Also cited are Davis, The Plaintiff's Illegal Act as Defense in Actions of Tort, 18 Harv.L.Rev. 505 (1905) and Thayer, Public Wrong and Private Action, 27 Harv.L.Rev. 317, 340–342 (1913).

8. \* \* \* There is nothing in the language of the antitrust acts which indicates that Congress wanted to make the common-law *in pari delicto* doctrine a defense to treble-damage actions, and the facts of this case suggest no basis for applying such a doctrine even if it did exist. Although *in pari delicto* literally means "of equal fault," the doctrine has been applied, correctly or incorrectly, in a wide variety of situations in which a plaintiff seeking damages or equitable relief is himself involved in some of the same sort of wrongdoing. We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suite serves important public purposes. *Id.* at 138, 88 S.Ct. at 1984.

9. "Both Simpson [Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed. 2d 98] and Kiefer-Stewart [Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219] were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since

ticipation by a plaintiff in an illegal conspiracy in restraint of trade is not to bar him, it follows that his violation of a state statute which is unrelated to the antitrust laws would carry even less moral impact and would assume even less applicability as a barrier to an antitrust suit.

Since the policy values inherent in the antitrust statutes even more clearly outweigh any social value flowing from a state licensing statute such as the instant Oklahoma one, we conclude that the district court erred in refusing to distinguish between a conspiracy to activate state processes, including the obtaining of an injunction (which actions as we see them are within the *Parker-Noerr* exemption), and on the other hand preemption of the area by a state statute, to the extent that it would of itself bar and exclude an antitrust action. Giving this effect to the state statute would extend substantially the *Parker-Noerr* exemption and would at the same time have the effect of disregarding the public policy objectives of the antitrust laws.

■ On retrial, only those injuries and damages proven to have resulted from conspiracies other than those held to have been related to petitioning and obtaining official state action need be tried. Thus, all post injunction damages allegedly suffered from loss of new and unused car sales were and are now properly excluded.[10] And all preinjunction injuries and damages resulting from conspiracies to obtain official intervention and enforcement are likewise excluded.

## V.

## ADVISING THE JURY THAT ITS VERDICT IS TO BE TREBLED

■ Was it error for the trial court to reveal to the jury that its award would be trebled? There is a division of authority as to whether this is proper.[11] The purpose of the trebling provision is to encourage enforcement of the antitrust laws, and the treble damages thus serve as an incentive. See Kinnear-Weed Corp. v. Humble Oil & Ref. Co., 214 F.2d 891 (5th Cir. 1954). It also constitutes a penalty for violation and thus serves as a deterrence.

■ The consequence of advising the jury of this can only be that the jury will adjust its award accordingly. But in an antitrust case it is not for the jury to fix the amount of the judgment. Its function is completed once it determines the amount of *damages*. As we view it, therefore, it serves no useful function to communicate this information to the jury and it is potentially harmful, and hence this action of the trial court was error.

If the judgment were to be affirmed, we would consider the error harmless since there existed little room in the evidence under the trial court's instruction to award *any* damages. In view, however, of the limited retrial, we must notice the ruling so that it can be avoided on retrial.

---

they remain fully subject to civil and criminal penalties for their own illegal conduct. Kiefer-Stewart, *supra.*" 392 U.S. at 139, 88 S.Ct. at 1984.

10. This is in pursuance of the holding of the trial court and our holding as well that plaintiff had no right to sell new cars once he was enjoined.

11. See, e. g., Judge Holtzoff's opinion in Webster Motor Car Company v. Packard Motor Car Company, 135 F.Supp. 4 (D. D.C.1955), and Judge Grim's opinion in Sablosky v. Paramount Film Distributing Corporation, 137 F.Supp. 929 (E.D.Pa. 1955) for the view that informing the jury is contrary to good practice, and see, e. g., Judge Clark's opinion in Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, 203 F.2d 676 (2d Cir. 1953) for the opposing view.

## VI.

### THE GRANT OF SUMMARY JUDGMENT AS TO FORD MOTOR COMPANY

 We disagree with appellant that the trial court erred in summarily dismissing Ford Motor Company. It is true that summary judgment is not favored in antitrust cases, but the Supreme Court has held that such a claim need not go to trial where there is a lack of evidence to support the allegations. The trial court gave Ford a partial summary judgment on May 8, 1970, dismissing so much of the plaintiff's claim as alleged that Ford had induced its dealers to refuse to deal with plaintiff. Even after this plaintiff was given further opportunity to show Ford's connection with the conspiracy. However, a final summary judgment was granted on July 27, 1970, and at that time the trial court said:

> Plaintiff has deposed officers of Ford which he previously claimed would have knowledge of the facts essential to plaintiff's claims, to no avail. Plaintiff has been given ample opportunity to discover any evidence to support his claim of Ford's membership in the alleged conspiracy. At this late date, no evidence on which findings of fact sufficient to support the legal conclusion of conspiracy could be grounded has been presented to the Court. (Order of trial court, July 27, 1970).

About the only evidence that the appellant points to is an out-of-court statement made by a Ford dealer. However, when his deposition was taken he denied that he had been pressured by Ford in any way. This cannot be regarded as evidence creating a genuine issue of fact under Rule 56, F.R.Civ.P.

## VII.

Inasmuch as the case is to be reversed, there is no need to consider the contention as to the inadequacy of the award of attorneys' fees. The court was confronted with a very small recovery and was limited in view of this in the award of attorneys' fees. However, the matter can be considered anew when the cause is retried.

We see no error in the allowance of the offset resulting from the earlier settlement. The judgment is reversed and the cause remanded for further proceedings, consistent with the views expressed herein.