679 F.2d 805
 1982-1 Trade Cases 64,668
 PUEBLO AIRCRAFT SERVICE, INC., a Colorado corporation,
Plaintiff-Appellant,
v.
The CITY OF PUEBLO, COLORADO, a Municipal corporation,
Thomas Lopez, Individually and as Director of Aviation for
the City of Pueblo, Pan-Ark Aviation, Inc., a Colorado
corporation, and George Rabatin, Jr., Defendants-Appellees.
 No. 80-2083.
 United States Court of Appeals,
Tenth Circuit.
 April 13, 1982.
 
 Alan L. Sulzenfuss, Salida, Colo. (Maurice R. Franks, Pueblo, Colo., with him on brief), for plaintiff-appellant.
 Thomas E. Jagger, Pueblo, Colo. (Joseph A. Vento of Kettelkamp, Vento & Brown, Pueblo, Colo., with him on briefs), for defendants-appellees.
 Before SETH, Chief Judge, and BARRETT and DOYLE, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 This is an action involving alleged federal antitrust act violations brought by plaintiff-appellant, Pueblo Aircraft Services, Inc. (Pueblo Aircraft) under 15 U.S.C.A. 67;§ 1[1] and 14[2] against the City of Pueblo, Colorado (City), Thomas Lopez, City's Director of Aviation, Pan-Ark Aviation, Inc. and George Rabatin, Jr., arising from City's operation of a municipal airport.
 
 
 2
 The district court, 498 F.Supp. 1205, granted the defendants-appellees' motion for summary judgment, finding/concluding that City is immune from the federal antitrust laws and further that no genuine claim is stated against the other defendants-appellees. The trial court pertinently observed after finding/concluding that City is immune from federal antitrust laws, that if this conclusion is correct, no further consideration of the summary judgment motions is necessary "(s)ince all antitrust claims of the plaintiff against all the remaining defendants are based on alleged violations by the City of the Federal antitrust laws ..." (R., Vol. I, p. 182). Thus, the district court dismissed the suit with prejudice as to all defendants on the ground that no claim had been stated upon which relief can be granted. The court granted summary judgment based upon extensive pleadings, voluminous depositions, documents, affidavits filed in support of and in opposition to the motions, briefs of the respective parties, and an open court hearing.
 
 
 3
 We approach this review aware that summary procedure should be used sparingly in antitrust litigation, Poller v. Columbia Broadcasting, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and that summary judgment should issue only where there is no genuine issue of material fact. Harman v. Diversified Medical Investments Corporation, 488 F.2d 111 (10th Cir. 1973), cert. denied, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1979). Factual inferences tending to show triable issues of material fact should be viewed in the light most favorable to the existence of such issues in assessing a motion for summary judgment. Harsha v. U. S., 590 F.2d 884 (10th Cir. 1979).
 
 Facts
 
 4
 The facts stated most favorably to Pueblo Aircraft are as follows. In 1948 City acquired from the federal government by deed a tract of land which had been used as a military airfield during World War II, granted for the specific purpose of establishing a municipal airport. At the time of acquisition, there were certain facilities available to City on the premises for airport operations including hangars and a storage facility to store aviation fuel. Since prior to 1970, City granted leases to three "fixed base operators" who operated businesses upon specific portions of the airport lands so leased and performed specific services which were monitored by City, including refueling of aircraft, sale of new and used aircraft, repair and maintenance of aircraft, sale of aircraft parts and supplies, rental and charter of aircraft, conduct of a flying school, operation of food vending machines, storage of aircraft, and the manufacture of aircraft parts and components. The lease agreements with each of the "fixed base operators"[3] required them to purchase all aviation fuel from City for resale.[4] The three fixed base operators were defendants Pan-Ark, Flower Aviation and the plaintiff-appellant, Pueblo Aircraft.
 
 
 5
 In 1970, Willard J. Teel and Betty I. Teel acquired all of the stock of Pueblo Aircraft and thereafter actively managed a fixed base operation under the lease granted by City, which expired on March 31, 1977, but was extended to June 31, 1977.
 
 
 6
 Several months prior to the expiration of Pueblo Aircraft's lease, City determined to require public bidding for the lease, upon its termination, of the premises and improvements leased to Pueblo Aircraft. The only bidders were Pueblo Aircraft and Pan-Ark. Pan-Ark was declared the successful bidder and City authorized a lease of the premises formerly occupied by Pueblo Aircraft to Pan-Ark commencing July 1, 1977.
 
 
 7
 At all times since the acquisition of the airport, City has been a "home rule" city, chartered pursuant to Art. XX, Section 6 of the Colorado Constitution which permits City to exercise "the full right of self-government in both local and municipal matters" and provides that the charter or ordinances enacted by City pursuant to such authority shall supersede the statutes of Colorado in exercising self-government.
 
 
 8
 City, at all times following acquisition of the airport, assumed control and responsibility for providing and maintaining the storage facility, monitoring the quality of fuel, providing fire protection and assuring the supply of aviation fuel to serve the needs of the fixed base operators and other aircraft using the airport who were not supplied by the fixed base operators. All leases entered into between City and the fixed base operators required the operators-lessees to purchase all aviation gasoline or propellants dispensed by them from City. The storage facility was on the premises when the property was acquired by the City. It was an underground fuel storage facility located away from the buildings and ramp area, and City daily monitored the fuel in order to assure its quality before it was dispensed to the fixed base operators. The City purchased the fuel through competitive bidding. At no time did any fixed base operator offer to construct its own storage facility on the airport premises so as to obtain aviation fuel independent of City.
 
 Trial Court's Ruling
 
 9
 The district court found/concluded that City is immune from the federal antitrust laws primarily by virtue of its status as a "home rule city" chartered pursuant to Article XX, Section 6 of the Colorado Constitution. The court relied on Community Communications Co. v. City of Boulder, 630 F.2d 704 (10th Cir. 1980) as authority for the proposition that City's operation and management of the airport was exempt from federal antitrust laws by virtue of its power and authority as a "home rule" city. In Community Communications Co. v. City of Boulder, --- U.S. ----, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) the Supreme Court reversed our decision reported in 630 F.2d 704, supra, and held that an ordinance enacted pursuant to Colorado's "home rule" authority does not constitute municipal action exempting it from antitrust scrutiny because it does not constitute municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy as enunciated in California Liquor Dealers v. Midcal Aluminum, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), and Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The parties agree here that in light of Community Communications Co. v. City of Boulder, supra, the district court's reliance on the "home rule" status of City for exemption from antitrust scrutiny must fail.
 
 
 10
 However, the district court alternatively relied on a specific statutory authorization granted to City as a further ground for its immunity determination. The court found that the State of Colorado has specifically authorized City to acquire and operate a municipal airport and that such acquisition and operation "are hereby declared to be public, governmental functions, exercised for a public purpose and matters of public necessity" by virtue of C.R.S.1973 § 41-4-101 which provides:
 
 
 11
 The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; the acquisition of airport protection privileges; the acquisition, establishment, construction, enlargement, improvement, maintenance, equipment, and operation of airports and other air navigation facilities; and the exercise of any other powers granted in this part 1 to any county, city and county, city, or town are hereby declared to be public governmental functions, exercised for a public purpose, and matters of public necessity; and such lands and other property, easements, and privileges acquired and used in the manner and for the purposes enumerated in this part 1 are hereby declared to be acquired and used for public purposes and as a matter of public necessity.
 
 
 12
 The district court concluded, then, that City, in its dealings with the fixed base operators, "is immune from the Federal antitrust laws", and, because all antitrust claims of Pueblo Aircraft against all other defendants were necessarily based on alleged violations by City, the immunity of City required granting of summary judgment motions of dismissal with prejudice as to all defendants. However, in an abundance of caution, the trial court determined it desirable, should its ruling on City's immunity be reversed on appeal, to address all other questions raised by the summary judgment motions. The court thereupon, in detail, addressed and ruled upon each of Pueblo Aircraft's remaining antitrust claims and found/determined that each was without substance, and that there were no specific facts showing that there were any genuine issues for trial as to any claims against the remaining defendants. We agree. We rely upon the district court's detailed opinion and order of September 26, 1980, in affirming the district court's grant of summary judgment to the remaining defendants.
 
 Our Disposition
 
 13
 The sole issue we shall discuss on appeal is whether the district court erred in finding/concluding that City is immune from the federal antitrust laws in its dealing with the fixed base operators in the operation of the municipal airport.
 
 
 14
 In Community Communications Co. v. City of Boulder, supra, the Supreme Court made it clear that a municipality is not exempt from the antitrust laws unless it constitutes the action of the state itself or was municipal action in furtherance or implementation of state policy by means of a "clear articulation and affirmative expression" contemplating a municipality's anticompetitive program. The Court stated, inter alia :
 
 
 15
 Our precedents thus reveal that Boulder's moratorium ordinance cannot be exempt from antitrust scrutiny unless it constitutes the action of the State of Colorado itself in its sovereign capacity, see Parker, or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy, see City of Lafayette, Orrin W. Fox Co., and Midcal...
 
 
 16
 ... When Parker examined Congress' intentions in enacting the antitrust laws, the opinion noted that "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.... (And) an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U.S., at 350-351, 63 S.Ct. at 313 (emphasis added)....
 
 
 17
 But plainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere neutrality respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended within the powers granted," since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality.
 
 
 18
 --- U.S. at ----, ----, 102 S.Ct. at 841, 843.
 
 
 19
 In keeping with the commands of Community Communications Co. v. Boulder, supra, the key inquiry, we believe, is whether the State of Colorado by affirmative legislative action granted City an exemption from operation of federal antitrust laws by virtue of the statutory language contained in C.R.S.1973, § 41-4-101, supra. We hold that it does. We affirm the district court.
 
 
 20
 In Lafayette v. Louisiana Power & Light Co., supra, the Supreme Court held that in order to find that a subordinate state governmental body is exempt from the operation of federal antitrust laws it must be found that the state legislature contemplated certain type of anticompetitive restraint in authorizing the subordinate body to perform and engage in certain activity and, pertinently, that it is not necessary to point to express statutory mandate for each act that is alleged to violate the antitrust laws, and that it will suffice if the activity in issue is found to be clearly within legislative intent.
 
 
 21
 In E. W. Wiggins Airways, Inc. v. Massachusetts Port Auth., 362 F.2d 52 (1st Cir. 1966), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966), suit was brought under the federal antitrust laws against the Port Authority and a fixed base operator at Boston's Logan Airport, alleging an antitrust conspiracy in forcing the plaintiff, who previously held a fixed base operator's lease at the airport which the Authority had refused to renew, to sell its business and equipment at the airport to the new fixed base operator at a minimal figure. The plaintiff sought damages pursuant to the Sherman Act from the Port Authority and the new fixed base operator. In affirming the district court's judgment dismissing the complaint, the court said, inter alia:
 
 
 22
 By statute it (the Port Authority) has been constituted a public instrumentality and the exercise of the powers conferred upon it is deemed and held to be the performance of an essential governmental function ... As stated by the Massachusetts Supreme Judicial Court in Opinion of the Justices, 334 Mass. 721, 731, 136 N.E.2d 223 (1956), the Authority "is in no sense a private or business corporation * * * It has no stockholders. No person can derive a profit through its operations. Only the public is to be benefited * * * "
 
 
 23
 It is described in the act creating it as "a body politic and corporate" which expression the Court said "is appropriate to a corporation to which is entrusted some of the powers of the State for public purposes" ... The court also characterized the Authority "as a purely public corporation for public purposes-an arm of the State-analogous to a municipal corporation." Logan Airport is and always has been a public project.
 
 
 24
 In carrying out its responsibilities the Authority decided that it was necessary to have only one fixed base operation at Logan and pursuant to that decision, entered into the lease with Butler-Boston. It is clear that in doing so it was acting as an instrumentality or agency of the state, pursuant to the legislative mandate imposed upon it to operate and manage the airport.... Plaintiff's contention that the Authority in operating Logan Airport is engaged in a purely proprietary capacity and is conducting a private business has no merit. Nor does the arrangement with Butler-Boston violate the Sherman Act. What was done here was in the exercise of a valid governmental functions. The antitrust laws are aimed at private action, not at governmental action. As stated by the Supreme Court in Parker v. Brown ... "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature * * * The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state * * *."
 
 
 25
 362 F.2d at pp. 55, 56. (Emphasis supplied). (Footnotes omitted).
 
 
 26
 In Semke v. Enid Automobile Dealers Association, 456 F.2d 1361 (10th Cir. 1972), we pointed out that Parker v. Brown, supra, involved a California statute which authorized the establishing, through action of state officials, of programs for marketing of agricultural commodities produced in the state in such a way as to restrict competition among the growers and to maintain prices in the distribution of their commodities to packers. This act authorized the formation of marketing combinations comprised of a number of producers within a particular district. Our court emphasized that, although the combination involved private individuals, it was unquestionably formed under authority of state law and for the purpose of advancing a state economic program, and consequently ... "it was indeed state action." 456 F.2d at p. 1366.
 
 
 27
 Semke recognized the "state action" exemption under facts and circumstances encompassing private or individual "proprietary" gains deemed to be important in the advancement of a state's economic program. It seems that the recognition of exemption from the antitrust laws under such circumstances mandates recognition of the exemption to City in the case at bar.
 
 
 28
 In Rocky Mountain Motor Co. v. Airport Transit Co., 124 Colo. 147, 235 P.2d 580 (1951), the Court held that the City of Denver, in establishing its municipal airport by virtue of a special 1929 ordinance whereby the operation of the airport was assigned to the city's Department of Improvements and Parks was acting in a proprietary rather than a governmental capacity. Significantly, however, the Colorado Supreme Court pointed out that it was not until 1945 that the Colorado legislature enacted legislation declaring the operation of publicly owned airport facilities to be a governmental function. Having done so, the court referred to those airports being operated under authority of the statute as those operated as a "... governmental function assigned to it to enforce the general policy of the state in the administration of general laws." 238 P.2d at p. 586.
 
 
 29
 In Duff v. City and County of Denver, 147 Colo. 123, 362 P.2d 1049 (1961), the Court held that a state statute authorizing the condemnation of private lands by eminent domain proceedings by counties, cities and towns was in recognition of the public necessity and public purpose "... for the installation of necessary Airport facilities, such as service roads, aircraft taxiways, airplane parking appurtenances, airplane hangars, airplane shopping facilities, and other similar appurtenances to the Airfield." 362 P.2d at p. 1050.
 
 
 30
 In its "governmental capacity" a municipality acts as an arm of the state for the public good on behalf of the state rather than itself. See: Schwalb v. Connely, 116 Colo. 195, 179 P.2d 667 (1947) (recognizing immunity of city from liability in operation of general hospital it owned and operated by virtue of power delegated to it by state for welfare and protection of inhabitants); Kirksey v. City of Fort Smith, 227 Ark. 630, 300 S.W.2d 257 (1957) (airport operation and maintenance under state statute declaring such operation to be a governmental function).
 
 
 31
 Those courts which have held the ownership, maintenance and operation of a municipal airport to be a "proprietary function" instead of a "governmental function" have generally done so in the absence of a statute such as C.R.S.1973, § 41-4-101, supra, and have found that the municipality acts mainly for its own ends, purposes and benefits, separable from and in addition to any burdens and benefits imposed or conferred by the state government. In the absence of an express statutory direction, such as that contained in C.R.S.1973, § 41-4-101, supra, the operation of a municipal airport is generally regarded as a proprietary function rather than a governmental function. See 56 Am.Jur.2d, §§ 199, et seq.; 66 A.L.R.2d 634; 25 A.L.R.2d 1048; 141 A.L.R. 1440.
 
 
 32
 The primary duty of the courts is to seek out and ascertain the legislative intent. Where the language of the statute is clear, plain and unambiguous, the duty of interpretation does not arise and rules designed to aid doubtful meanings do not come into play. Here, the Colorado legislature, by virtue of C.R.S.1973, § 41-4-101, supra, has expressly declared the operation of the airport facilities "... to be public governmental functions, exercised for a public purpose, and matters of public necessity..." In Hannon v. City of Waterbury, 106 Conn. 13, 136 A. 876 (1927) the court identified two distinct categories of governmental functions of a municipality-one, those duties imposed or authorized by the state for "the benefit of the general public" and the other, those duties which are "for the particular advantage of the inhabitants of the municipality, and only ... indirectly for the benefit of the people at large." See also: Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898). Clearly, City's airport is one operated for the benefit of the general public and not for the particular advantage of the inhabitants of the City of Pueblo. This is best evidenced by the following allegation contained in Pueblo Aircraft's complaint:
 
 
 33
 6. PUEBLO MEMORIAL AIRPORT is a major airport located on major crosscountry interstate air routes and is utilized by local and interstate private aircraft and passengers, local and interstate commercial aircraft and passengers, and by United States military aircraft and personnel. PUEBLO MEMORIAL AIRPORT is the largest facility for refueling aircraft along the route of V-244 between Salina, Kansas and San Francisco, California. V-244 is a major air route connecting San Francisco with the Eastern United States.
 
 
 34
 (R., Vol. I, pp. 1, 2).
 
 
 35
 WE AFFIRM.
 
 
 
 [1]
 15 U.S.C.A. § 1 provides in pertinent part: "Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, ... is declared to be illegal."
 
 
 [2]
 15 U.S.C.A. § 14 provides in pertinent part: "It shall be unlawful for any person engaged in commerce ... to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities ... for use, consumption, or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."
 
 
 [3]
 A fixed base operation is one that requires the operator who enters into a lease agreement-contract with City to provide specific facilities, services, equipment and personnel to meet the requirements for certain operations of an airport used by aircraft, passengers, crews and freight shippers. In most cases, the leases include those portions of the airport premises with hangars and other improvements thereon where the services and supplies are performed and kept
 
 
 [4]
 The lease agreement proviso, as modified on August 2, 1974, reads: "Lessee agrees to purchase from the City all aviation gasoline or propellants dispensed through Lessee's operation at the City's cost, plus five and one-half cents (5 1/2cents) per gallon. Lessee shall be billed monthly for all gasoline purchased during the month, and such bills shall be due and payable upon billing."