The **WEBSTER MOTOR CAR COMPANY** et al., Plaintiffs,

v.

**PACKARD MOTOR CAR COMPANY** et al., Defendants.

Civ. A. No. 674–53.

United States District Court
District of Columbia.
Oct. 25, 1955.

See also D.C., 16 F.R.D. 350.

William E. Leahy and William J. Hughes, Jr., Washington, D. C., for plaintiffs.

Harold L. Smith, New York City, Louis M. Denit and Robert W. Barker, Washington, D. C., for defendants.

HOLTZOFF, District Judge.

This case is before the court at this time on motions by the defendants for judgment notwithstanding the verdict or, in the alternative, for a new trial.

This action was brought to recover triple damages under the Antitrust laws.[1] The plaintiff was one of several dealers in Packard automobiles in Baltimore, Maryland, pursuant to a contract with the defendant Packard Motor Car Company. The plaintiff claims that as a result of a conspiracy between this defendant and a rival dealer, it was unlawfully deprived of its contract, and the competitor was made an exclusive dealer in Packard cars in the Baltimore area. After a trial on the merits the jury returned a verdict for the plaintiff for the sum of $190,000. Pursuant to the mandatory direction of the statute, the court ordered judgment to be entered for three times that amount, namely, $570,000.[2]

The basic questions raised by the motion for judgment notwithstanding the verdict are: first, whether there was substantial evidence justifying the submission of the case to the jury on the issue of liability; and second, whether there is substantial evidence to sustain the verdict of the jury as to the amount of damages.

It is an elementary rule that on such motions the evidence must be viewed from the standpoint most favorable to the prevailing party.[3] Some of the evidence introduced at the trial was conflicting. The jury would have been justified, however, in finding the following facts from the evidence adduced in behalf of the plaintiff.

The defendant Packard Motor Car Company is a manufacturer of automobiles. It sells its product through dealers located at various points throughout the country. Every dealer operates under a contract with the defendant, sometimes known as a franchise. Such a contract runs for the period of one year, but the usual practice of the defendant is to renew it from year to year so long as the dealer's services are satisfactory. For a number of years there were four Packard dealers in Baltimore, Maryland, of whom the plaintiff, Webster Motor Car Company, was one. The plaintiff's contract was continued from year to year over a considerable period. In fact, when on one occasion the plaintiff's plant burned down as a result of a disastrous fire and the plaintiff had some doubt whether to rebuild or to go out of business, the defendant encouraged the plaintiff to pursue the former course and, in fact, assisted it in the preparation of architect's plans for reconstructing its building. It was reasonable to infer that under ordinary circumstances the plaintiff's contract would have been renewed from year to year as long as its services were satisfactory, and as long as it wished to remain in business as a dealer in Packard cars. In course of time, one of the four dealers in Baltimore, gave up its franchise. Consequently at the crucial period involved in this case, there were three Packard dealers in that city. They were the plaintiff, the Zell Motor Car Company, and DeBaugh Motors. The plaintiff continually operated at a profit, although the amount of the profit varied considerably from year to year.

In the winter of 1952, Sidney Zell, the President of the Zell Motor Car Company, approached the defendant Packard Motor Car Company, and informed its officials that his company was operating at a loss and would not continue to sell Packard cars unless the defendant gave it an exclusive contract and eliminated all rival dealers. After some conferences

1. 15 U.S.C.A. § 15.

2. This is the procedure generally followed in such cases, Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, 849; Bordonaro Bros. Theatres, Inc., v. Paramount Pictures, 2 Cir., 176 F.2d 594, 596.

3. Baltimore & Ohio R. Co. v. Postom, 85 U.S.App.D.C. 207, 177 F.2d 53.

among themselves, the Packard officials decided to agree to Zell's proposal and so informed him. In order to carry out this scheme, Packard representatives apprised DeBaugh that his franchise would not be continued. They also informed the plaintiff that its contract would not be renewed, without advancing any ground for this action. Richard Webster, the President of the plaintiff corporation, implored the defendant to reconsider, expressing his desire to continue as a Packard dealer, inquiring whether there was any dissatisfaction with his performance, and offering to make changes and improvements in any manner desired by Packard. The latter declined to give any reason whatsoever for its attitude, but remained adamant. When the plaintiff continued its protests, Packard finally offered to renew its franchise for one year. The plaintiff countered by requesting some assurance of good faith, as apparently it had become suspicious. Zell, on the other hand, secretly protested to Packard against its offer to renew the Webster franchise for one year, and the Packard officials in effect told him that this renewal would be the last so far as Webster was concerned, without, however, giving this information to Webster. The latter wound up its Packard business and tried to sell cars of a different make. Apparently it was not successful. The Webster Motor Car Company then discontinued business altogether. Its claim in this action is based on the contention that the arrangement between Packard and Zell constituted a conspiracy violative of the Antitrust Laws. The plaintiff sought to recover triple damages suffered as a result of being allegedly driven out of business in the manner above outlined.

The principal question is whether the foregoing facts constitute a contract or conspiracy in unreasonable restraint of interstate commerce or a combination or conspiracy to monopolize any part of interstate commerce, or whether the defendant acted within its legal rights.

■ Unquestionably, a business concern has a right to select its own customers. It has the privilege of selling its products to whomever it chooses, to refrain from dealing with any one, and to prefer one potential customer over another. Consequently, if the Packard Motor Car Company of its own initiative, for whatever reasons it deemed best, determined that thereafter there should be only one Packard dealer in Baltimore, who would receive an exclusive franchise, and that this dealer should be the Zell Motor Car Company, there would probably have been no violation of the antitrust laws.[4] That is not this case, however. The right to select one's customers is a right that may be exercised free from compulsion and without agreements with others that tend unreasonably to restrain interstate commerce or to create a monopoly. Such a choice may not legally result from an agreement or arrangement or conspiracy between two or more individuals, or two or more business concerns, to exclude others from the channels of trade, or to attempt to create a monopoly or substantial monopoly for one of the parties to the agreement.[5] The purpose of the antitrust laws is to keep the channels of competition open and free and to prevent their becoming blocked by agreements to force competitors from the field. If as a result of greater energy or efficiency, Zell had acquired a larger share of the business and the plaintiff had fallen by the wayside, the latter would not have had any basis for complaint. The law, however, does not countenance agreements to drive a competitor out of the market by artificial means. An agreement to exclude a rival is of an entirely different nature from free competition that may indeed at times result

---

4. G. & P. Amusement Co. v. Regent Theater Co., D.C.N.D.Ohio, 107 F.Supp. 453, affirmed 6 Cir., 216 F.2d 749; Boro Hall Corp. v. General Motors Corporation, 2 Cir., 124 F.2d 822; Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268.

5. Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846; Bordonaro Bros. Theatres, Inc., v. Paramount Pictures, 2 Cir., 176 F.2d 594.

in economic death for one of the competitors.

This line of demarkation was aptly drawn as follows by Judge Freed in G. & P. Amusement Co. v. Regent Theater Co., D.C.N.D.Ohio, 107 F.Supp. 453, 463, whose decision was affirmed by the Court of Appeals for the Sixth Circuit, 216 F.2d 749:

> "The opportunity of a business entity, when acting without ulterior motives and *free from compulsion,* to sell its product to one potential customer in preference to another, exemplifies precisely the type of economic system upon which American business thrives. This Court has never regarded the Sherman Act as an instrument requiring a dealer in commodities to sell to all comers, when to do so will be to run the risk of destroying a good customer by selling to another when it is simply an economic impossibility for both to exist—*provided, of course, that there is no wrongful use of monopoly power or conspiracy to restrain trade.*" (Emphasis supplied.)

The applicable rules of substantive law are found in the Sherman Act and read as follows:

> "Every contract, * * * or conspiracy, in restraint of trade or commerce among the several States, * * * is declared to be illegal: * * *."[6]

> "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, * * * shall be deemed guilty of a misdemeanor".[7]

■■ It is well established that the first of the foregoing sections must be construed as though it read, "Every contract or conspiracy in *unreasonable* restraint of trade or commerce, is declared to be illegal."[8] The term "conspiracy" is of course not to be interpreted as though it had an opprobrious connotation. It means merely an agreement or contract forbidden by law.

■ In the case at bar the court submitted to the jury the issue as to what the facts were, as well as the determination of the ultimate fact,—whether the transaction constituted an unreasonable agreement in restraint of trade among the several States, or an agreement to attempt to monopolize. The jury by its verdict found that such an illegal agreement existed. This it had a right to do. It had a right to reach the conclusion that an agreement on the part of the manufacturer with one of its own dealers to terminate the franchise of all competitors and to grant to him a monopoly within a certain area, is an agreement in unreasonable restraint of trade, or an agreement to monopolize.

■ Since Packard automobiles are manufactured outside of the State of Maryland and are shipped by Packard to its dealers in Baltimore, interstate commerce was obviously affected. The jury was also justified in finding from the evidence that the agreement involved in this action substantially restrained competition. Evidence was introduced tending to show that in addition to competition among dealers in different makes of motor vehicles, there is competition among dealers selling automobiles of the same make, such competition involving allowances on used cars turned in as part payment for new vehicles, terms of sale, and efficiency of service. Competition of this second type was manifestly eliminated, or at least substantially diminished, by the arrangement in question, insofar as sales of Packard cars in the Baltimore area were concerned.

---

6. Section 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1.

7. Section 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 2.

8. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663.

■ The court, therefore, concludes that there was substantial evidence justifying the submission of the case to the jury on the issue of liability. There remains for consideration the problem whether there is substantial evidence to sustain the verdict as to the amount of damages.

■ The law on this question is clear. Necessarily, the amount of damages to be awarded must be based on evidence. It must be such sum as would fairly and reasonably compensate the plaintiff for the pecuniary loss that it has sustained. The jury may not speculate *in vacuo* or guess at an amount, or fix damages arbitrarily. On the other hand, it is sufficient if the evidence supplies information from which the jury may arrive at an approximate amount of damages that the plaintiff probably sustained, as a matter of reasonable inference. It is not necessary to show the precise sum that the plaintiff has lost, because ordinarily such an exact computation is not feasible. The law does not require the impossible, for otherwise a wrongdoer might entirely escape liability for damages caused by his illegal acts. The risk of uncertainty is to be thrown on the wrongdoer, rather than on the injured party. It is enough if the evidence shows the extent of the damages as a matter of reasonable inference, even though the result may be only approximate. The jury may form a reasonable estimate of the probable loss in the exercise of its good sense and sound judgment on the basis of the evidence.[9]

■ In this case the court instructed the jury that the measure of damages was the value of the plaintiff's business claimed to have been destroyed by the defendant's illegal acts. The evidence that enabled the jury to evaluate the loss consisted of proof of the amount of profits realized annually by the plaintiff from its automobile business during the period beginning in 1946 and ending in 1952, when the plaintiff discontinued the sale of Packard automobiles, coupled with a showing that the plaintiff then had an unexpired term of over seven years on the lease on its plant. In addition, evidence was introduced tending to show that in 1952, the automobile business generally was at an up-swing; that the plaintiff's annual profits were gradually increasing; and that the outlook for further growth was good, because the defendant had introduced a new model that was meeting with public favor. The defendant, on the other hand, disputed the plaintiff's computation of its profits, and also introduced evidence tending to show that in 1953, many Packard dealers whose business was of approximately the same size as the plaintiff's, sustained a loss instead of realizing a profit. The evidence on both sides created a question of fact, which the jury resolved in the plaintiff's favor. On this basis, the verdict of $190,000 was entirely within the bounds of reason and is sustained by the evidence.

On the motion for a new trial, the defendant advanced several additional propositions, three of which warrant a brief notice.

■ The court denied the defendant's request that the jury be informed that the amount of damages that would be awarded by it would be multiplied by three by the court. The court instructed the jury as follows:

"The damages to be awarded by the jury should be in such amount as would in the opinion of the jury fairly and reasonably compensate the plaintiff for the financial or pecuniary loss to its business,—in other words, the amount of money that the plaintiff lost in its business as a result of the illegal acts of the defendant."

9. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652; Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, 855.

The court further stated:

"The measure of damages in this case is what was the value of the plaintiff's business claimed to have been destroyed by the defendant's illegal acts."

There was no reason for informing the jury that whatever damages they would award would be trebled, because this is a matter solely for the court. In fact, the jury might have taken such a statement as an intimation to keep the damages at a low level, in view of the fact that the amount allowed by the jury would be multiplied by three. This would have tended to defeat the purpose of the Act of Congress.

In this connection, it must be noted that it is the practice in this jurisdiction in civil cases not to give the pleadings to the jury. The custom is otherwise in criminal cases, as the indictment is generally handed to the jury. There may be some reason for imparting the information to the jury in those districts in which it is customary to supply the pleadings to the jury in civil cases, because otherwise the jury on reading the prayer for relief might be confused by the demand for triple damages and might be perplexed by a doubt whether it was its duty to multiply the actual damages by three.

Associate counsel for the defendant has selected a single ruling on a minor question of evidence out of a great many made during the three-weeks' trial, and has urged that the court erred in excluding a certain question on cross-examination. The importance of the question is magnified out of its context, and even if its exclusion were erroneous, the error would have been harmless. The matter would not be of sufficient importance to justify a new trial, as it could not possibly have affected the outcome of the trial. Actually, however, upon further reflection the court adheres to the ruling made at the trial. The defendant called as its witness one Donald Webster, the son of Richard Webster, the President of the plaintiff corporation. A series of questions were addressed to the witness that obviously were not germane to the issues involved in this case, and whose only effect seemed to be to embarrass him. The court nevertheless permitted the interrogation to proceed for awhile, not knowing whether it might result in developing something material. Finally the question was asked whether in another proceeding in another court, the witness had not misstated something that had occurred on an interlocutory motion in this case in this court. The court excluded the question on the ground of its irrelevancy. It served no legitimate purpose and merely seemed to humiliate the witness. The court is not unmindful of the fact that under Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the witness might well have been regarded as a hostile witness and, therefore, was subject to cross-examination by defendant's counsel even though the witness was called by the defendant. Nevertheless, it must not be overlooked that in a Federal court the extent of cross-examination as to credibility is subject to the reasonable control of the court, and may not be carried to whatever extent counsel desires.

The comments of the Court of Appeals in Bracey v. United States, 79 U.S.App. D.C. 23, 27, 142 F.2d 85, 89, although directed to another aspect of the law of evidence, are equally applicable to the case at bar:

"In fact, the situation of the present case provides a good example of the necessity for permitting the trial judge to exercise considerable discretion in admitting or rejecting evidence. He observes the conduct of counsel, the reactions of the witness under examination and the resulting effect upon the jury. In other words, he is aware, as no appellate court could be, of the courtroom psychology and, hence, is in a position to determine whether particular testimony should or should not be received."

Finally, defense counsel complains of the summing up argument to the jury made by counsel for the plaintiff,

and urges that it was inflammatory. It may be observed that both parties were represented by experienced trial counsel, who are members of the local bar of high standing. Each of them, as able trial lawyers are wont to do, indulged in flights of eloquence in his summing up to the jury with considerable skill. Neither counsel interposed any objection to the summing up of his opponent, either during the speech or after its conclusion. While the fact that no objection was advanced at the time, is not necessarily fatal if a miscarriage of justice has really resulted, nevertheless, this circumstance gives rise to a mental inquiry whether the contention later made is not an afterthought. Especially is this the case because the motion for a new trial was not argued by the trial counsel, although he was present in the courtroom at the time of argument, but was presented by out-of-town counsel who was associated with the trial counsel and who was admitted *pro hac vice*. In any event the court is of the opinion that the summation of each trial counsel was within the bounds of proper advocacy and that neither was inflammatory. Fortunately, we have not reached the stage of banning interesting and vivid oratory and confining arguments of counsel strictly to dull and prosaic remarks. The art of advocacy is not dead, although it must be confessed that at times it seems moribund. So, too, only one who has but little faith in trial by jury would really think that jurors are easily led astray by eloquence from the course charted by the evidence. The general experience of Federal trial judges is to the contrary. The effect of skillful summation of counsel is rather to silhouette or etch vital portions of the facts and the inferences to be drawn from them.[10]

It would be wise to bear in mind the sage and apt remarks of Judge Goodrich of the Third Circuit, in commenting on a similar contention in Smith v. Philadelphia Transp. Co., 173 F.2d 721, 726, which are equally applicable here. He said:

"Juries are not so likely to get excited or inflamed by lawyers' talk as lawyers think they are."

That the jury in this case reached its conclusion on the evidence and displayed keen discernment in considering and weighing it, is demonstrated by a rather significant episode. After several hours of deliberation, the jury sent a note to the court requesting to see a certain exhibit, which the note identified with precision, in spite of the fact that over two hundred exhibits had been introduced during the protracted trial. The exhibit was a document on which the question of defendant's liability largely hinged.

The motion for judgment notwithstanding the verdict and the motion for a new trial, are denied.

---

10. Coleman v. Moore, D.C., 108 F.Supp. 425, 426; Chapman v. Alton R. Co., 7 Cir., 117 F.2d 669, 672; Chesapeake & O. R. Co. v. Richardson, 6 Cir., 116 F.2d 860, 865; Green v. United States, 8 Cir., 266 F. 779, 784; Di Carlo v. United States, 2 Cir., 6 F.2d 364, 368, Learned Hand, J.