Willard M. NOBLE and Etta M. Noble,
Plaintiffs-Appellees,

v.

McCLATCHY NEWSPAPERS, a corpora-
tion, et al., Defendants-Appellants.

Willard M. NOBLE and Etta M. Noble,
Plaintiffs-Appellants,

v.

McCLATCHY NEWSPAPERS, a corpora-
tion, et al., Defendants-Appellees.

Nos. 72–2021, 72–2042.

United States Court of Appeals,
Ninth Circuit.

Nov. 14, 1975.

Rehearing Denied May 20, 1976.

See 537 F.2d 1030.

Richard Haas (argued), Brobeck, Phleger & Harrison, San Francisco, Cal., for defendants-appellants in 72–2021, for defendants-appellees in 72–2042.

Timothy H. Fine (argued), of the Law Offices of G. Joseph Bertain, Jr., San Francisco, Cal., for plaintiffs-appellees in 72–2021, for plaintiffs-appellants in 72–2042.

## OPINION

Before BROWNING and TRASK, Circuit Judges, and GRAY,* District Judge.

BROWNING, Circuit Judge:

Willard Noble and his wife, Etta, were distributors of the Sacramento Bee newspaper. Their distributorship was cancelled. They brought this private antitrust action against McClatchy Newspapers, publisher of the Bee, and seven individuals.[1]

Three claims are at issue on these appeals: First, that defendants violated section 1 of the Sherman Act to plaintiffs' injury by terminating plaintiffs' distributorship; second, assuming the lawfulness of the termination of plaintiffs' distributorship that defendants violated section 1 of the Sherman Act to plaintiffs' injury by preventing plaintiffs from selling their distributorship after termination; and third, that defendants violated section 2 of the Sherman Act to plaintiffs' injury by monopolizing the publication of daily newspapers of general circulation in the relevant market.

The case was tried to a jury. The jury returned a verdict for defendants on claim one (the termination claim) and three (the monopolization claim), and for plaintiffs on claim two (the sale-of-business claim). Judgment was entered in favor of plaintiffs on the sale-of-business claim in the amount of $63,333.04—$15,000 in damages, trebled, costs and attorneys' fees of $18,333.04.

---

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

1. The individual defendants are three officers of the corporation, two circulation department employees, and two persons who acquired plaintiffs' route following termination of plaintiffs' distributorship.

Defendants appeal the denial of their motion for judgment n. o. v. or a new trial on the sale-of-business claim. Plaintiffs appeal the denial of injunctive relief with respect to this claim. They also urge that errors in jury instructions and rulings on evidence infect the judgment as to the termination and monopolization claims, and seek a new trial on these claims if defendants succeed in their appeal of the judgment as to the sale-of-business claim.

## BACKGROUND FACTS

Willard Noble was an independent city newsstand distributor for the Sacramento Bee from October 1, 1960, to July 1, 1969, under three contracts with McClatchy Newspapers. Etta Noble was a party to the third of these contracts, entered on April 18, 1969.

Under the distributorship contracts, plaintiffs were responsible for sale and distribution of the Bee in an area referred to as "Newsstand # 5," encompassing a portion of the City of Sacramento and its suburbs. Plaintiffs purchased daily and Sunday copies of the Bee from McClatchy Newspapers at wholesale and resold them from newspaper vending racks and to retail outlets. Unsold papers could be returned at cost, but plaintiffs assumed full responsibility for copies lost through theft or other causes.

Paragraph nine of the distributorship contracts provided that if plaintiffs decided to transfer their route they would give McClatchy Newspapers sixty days' notice, that McClatchy had "the right to determine the qualifications of the proposed new distributor," and that McClatchy's consent to transfer "shall be required, and will not be unreasonably withheld." [2] Paragraph eleven provided that the contract "may be cancelled by either party at any time upon thirty days prior written notice to the other party."

By letter dated May 27, 1969, McClatchy Newspapers cancelled plaintiffs' distributorship effective July 1, 1969. The reason for this action was disputed. Plaintiffs contended their refusal to agree to split their distributorship territory "was a substantial factor in causing [McClatchy] to terminate them." Defendants contended that the distributorship was terminated because of Willard Noble's "continued stream of complaints" regarding such matters as late delivery of papers and McClatchy's refusal to compensate distributors for theft losses." [3]

According to defendants, the difficulties with Noble came to a head during a telephone conversation between Noble and defendant Carlo Bua, assistant circulation manager. Bua testified that the conversation "started as a griping session" during which Noble complained "about the thefts of his papers, the late papers, he couldn't get qualified help, and so forth and so on." Noble questioned whether the Bee was properly accounting for theft losses in reporting its circulation to the Audit Bureau of Circulation, an independent organization whose audits of publishers' circulation statements are heavily relied upon by advertisers. Noble also said he believed the distributorship contract was illegal insofar as it forbade bulk sales of unsold copies of

2. Paragraph nine was added to the city newsstand distributors' contracts in the spring of 1969, at the request of the distributors. Defendant Byron Conklin, circulation manager of the Bee, testified there never had been any "prohibition against selling a distributorship." Wentworth Kilgen, associate house counsel for McClatchy, testified that he approved the addition of paragraph nine to the contract because it was the "natural consequence" of the law "that a person can sell any asset that he has unless there is some restriction preventing him from doing so." He also stated "there was nothing to prevent the transfer of the distribu-

torship under the previous contract, because there was no restriction against it."

3. Defendants did not question Noble's competency as a distributor. Defendant Conklin testified that Noble was "very circulation conscious," that he "worked very hard to service his dealership," and that he "did a hell of a job" for the Bee. Defendant Carlo Bua, assistant circulation manager, testified that Noble was a "knowledgeable, experienced newspaper distributor." During Noble's nine years of service circulation of the Bee in Newsstand 5 increased approximately fourfold.

editions that contained advertising discount coupons.[4] Bua "mentioned" that the solution to Noble's problems would be to split his distributorship. Noble replied that "under no circumstances would he want to split his distributorship."[5] Bua reported the substance of the conversation to defendant Byron Conklin, the circulation manager.

Conklin testified that Noble's complaints were "the straw that broke the camel's back"; his "patience was exhausted." He consulted his supervisor, O. J. Brightwell, business manager of the Bee, explaining that "his department was no longer able to get along with Mr. Noble," and recommending that he be terminated. Brightwell agreed. The cancellation letter was sent the following day.

A few days later Conklin told Bua, "now is the best time to split Newsstand 5." He instructed Bua "to find a satisfactory boundary line." Noble asked for reinstatement. Conklin refused. Noble asked if he could sell his distributorship. Conklin said "he had nothing to sell," and in any event McClatchy had plans to split the distributorship. Noble asked that he be allowed to

"retain a portion of [his] dealership if it was split." Conklin refused.

Bua decided on a two-part division of Newsstand 5. Conklin initiated discussions with defendant Gary Downing, an employee of the Bee's circulation department, about becoming a distributor in a portion of Newsstand 5. Defendant James Gallagher, the Bee distributor for Newsstand 2, requested that he be considered for the remaining portion. Downing and Gallagher entered into distributorship contracts for the divided portions of Newsstand 5, effective July 1, 1969. With the permission of McClatchy, Gallagher sold his business in Newsstand 2 for $6,000.

## DEFENDANTS' APPEAL

The sole issue on defendants' appeal is whether the district court erred in denying their motion for judgment n. o. v. or new trial on plaintiffs' sale-of-business claim.[6] We agree with defendants that the motion should have been granted.

Instructions given by the district court on the sale-of-business claim are reproduced in the margin.[7] According to these instruc-

---

**4.** The bulk sale problem concerned McClatchy because of complaints by advertisers that unusually high percentages of coupons were being returned for redemption, including many they believed had not been used to purchase the advertised products. Noble admitted that in late 1967 or early 1968, he made bulk sales of about 5,000 copies of the Bee containing discount coupons, but claimed these sales were made with Conklin's knowledge and approval to reduce theft losses. Conklin denied this. Noble testified that in May 1968 Bua admonished him to stop selling in bulk, and he complied. Conklin subsequently informed the city newsstand distributors that bulk sales of editions with coupons would be cause for termination. Still later, in April 1969, distributor contracts were revised to provide that "sale of editions containing advertising coupons will not exceed the normal demand for single copy sales of such editions and that [the distributors] will not sell in bulk for purposes of abnormal use of said coupons."

**5.** Bua and Conklin admitted they had "suggested" to Noble on a number of prior occasions that he split his territory. They testified these suggestions were merely "constructive advice" as to how Noble might eliminate the problems he complained of.

Robert Gilliland, plaintiffs' expert on newspaper circulation practices, testified it was "in the best interests of management to keep [dealership] areas down to limited size," and if a dealer refused to split, management would "have to . . . take legal action to split the area or, quite frankly, cancel the man who won't split it."

**6.** Plaintiffs argue that defendants waived their right to raise this issue by failing to raise it below. However, defendants challenged the sufficiency of the evidence on the sale-of-business claim in their trial brief, in their proposed instructions, in their motion for directed verdict on the sale-of-business claim, and in their brief in support of the motion for judgment n. o. v. or new trial on this claim.

**7.** The relevant instructions, requested by plaintiffs, read:

The [second] claim in this case is that the plaintiffs . . . contend that they were injured by reason of defendants' alleged violation of Section 1 of the Sherman Act, in that defendants refused to permit plaintiffs to sell and transfer their newspaper distribution business known as Newsstand No. 5, as plaintiffs contend that they were entitled to do so pursuant to their ownership of said business.

tions the claim rested entirely upon the unlawfulness of defendants' refusal to authorize plaintiffs to sell Newsstand 5. For the purpose of this claim, lawfulness of the termination was to be treated as irrelevant. The jury was instructed to consider the sale-of-business claim separate and apart from the termination, and "irrespective of whether or not the termination of the contract was lawful." [8] It follows that plaintiffs' recovery under the sale-of-business claim may be sustained only if there was evidence from which the jury could con-

clude that *after* termination plaintiffs owned a valuable asset. Such proof was lacking.[9]

Upon receipt of the letter of termination, as defendants accurately put it, "plaintiffs owned nothing but a contractual right to distribute the Bee for thirty-odd days." The witnesses who testified regarding the value of this right agreed that it was worthless.[10] Nothing in the distributorship contract purported to give plaintiff a right to sell, after termination, as if termination had not occurred.[11] There was no

---

I will refer to this claim as the sale of business claim.

This sale of business claim is a different claim from the territorial claim which I have just instructed you on. This sale of business claim is made by both plaintiffs and is irrespective of whether or not the termination of the contract was lawful; that is, plaintiffs are saying that regardless of whether or not the termination of the contract violated Section 1 of the Sherman Act, as they assert in support of their territorial restriction claim, there was another and different violation of Section 1 of the Sherman Act which caused them injury.

This other and different violation of Section 1 claimed by the plaintiffs is that after the contract was terminated there was a contract, combination or conspiracy to prevent them from selling their business, that this contract, combination or conspiracy in fact prevented them from selling their business and that this contract, combination or conspiracy restrained interstate commerce unreasonably.

In order for plaintiffs to recover for this alleged violation of Section 1, plaintiffs must show that after the contract was terminated there was a contract, combination or conspiracy to prevent them from selling their business, if any, as a going concern, and that this contract, combination or conspiracy in fact prevented them from selling their business, if any, and that this contract, combination or conspiracy was in unreasonable restraint of interstate trade and commerce.

8. This portion of the instructions was necessary to enable plaintiffs to state a separate claim on the basis of McClatchy's refusal of permission to sell Newsstand No. 5 since the damage alleged under this claim and the termination claim was the same, *i. e.*, the going concern value of the distributorship.

9. We thus do not reach the following issues raised on defendants' appeal: (1) whether there was sufficient evidence that plaintiffs where prevented from selling their distributorship by a contract, combination or conspiracy that un-

reasonably restrained interstate commerce; and (2) whether there was sufficient evidence that defendants Eleanor and C. K. McClatchy and Walter Jones personally participated in or approved the allegedly unlawful conduct forming the basis of sale-of-business claim.

"It is well settled that a manufacturer may discontinue dealing with a particular distributor 'for business reasons that are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade.'" *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972), *quoting Richetti v. Meister Brau, Inc.,* 431 F.2d 1211, 1214 (9th Cir. 1970). Allowing plaintiffs in the present case to recover antitrust damages on the sale-of-business claim after losing the termination claim would in effect reverse the well settled law on the antitrust implications of distributorship terminations. Allowing plaintiffs to recover on the sale-of-business claim after winning on the termination claim would be to permit duplicative recovery.

10. This was the opinion of defendants and other representatives of McClatchy. It was shared, however, by one of plaintiffs' experts, Robert Gilliland, and by two distributors who testified on behalf of plaintiffs. It also appears to have been the view of plaintiffs' counsel as reflected in the following exchange with defendant Gallagher:

Q. And you do know that under this paragraph 11 of the contract the Bee could terminate you and you would have nothing to sell?
A. That's true.

11. The distributorship contract involved in *Albrecht v. Herald Co.,* 390 U.S. 145, 148, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), provided that if the contract were terminated the distributor would have 60 days to provide a satisfactory purchaser for his route, as the Court of Appeals pointed out, 367 F.2d 517, 519 (8th Cir. 1966).

evidence of a trade practice to this effect.[12] The only reasonable conclusion the jury could draw from the record was that no damage had been shown under the sale-of-business claim. *See Chisholm Bros. Farm Equip. Co. v. International Harvester Co.*, 498 F.2d 1137, 1139–40 & n. 5 (9th Cir. 1974). The insufficiency could not be cured by retrial; accordingly, the district court erred in refusing to grant the defendants' motion for judgment n. o. v.[13]

### PLAINTIFFS' CROSS–APPEAL

Because plaintiffs' judgment on the sale-of-business claim must be reversed, we consider plaintiffs' contention that they are entitled to a new trial on the termination and monopolization claims because of alleged errors in the jury instructions and in the admission and exclusion of evidence. We conclude that a new trial is required on the termination claim.

Plaintiffs alleged that their distributorship was terminated in substantial part because they refused to accede to defendants' request that they give up a part of the territory covered by the distributorship. The district court instructed the jury as follows:

> If you should find from the evidence that defendants or some of them wished plaintiffs to agree to confine their sales of the Sacramento Bee to a particular part of Newsstand No. 5, that the plaintiffs refused to agree to this, and that their alleged refusal was a substantial factor in the termination of the contract, you must then determine whether, if plaintiffs had agreed to the arrangements, an unreasonable restraint of inter-

state commerce would have resulted, as a result of being a part of an alleged arrangement between the Sacramento Bee, its distributors and carriers.

■ Plaintiffs contend that the district court should have instructed the jury that an agreement to restrict the territory in which newspapers purchased from McClatchy could be sold would have been a per se violation of section 1 of the Sherman Act, and it was therefore unnecessary for plaintiffs to prove an unreasonable restraint of interstate commerce would have resulted from such an agreement. Plaintiffs correctly state the law.

In *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 379, 87 S.Ct. 1856, 1865, 18 L.Ed.2d 1249 (1967), the Supreme Court held:

> Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. . . . Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale.

The rule of *Schwinn* is unequivocal:

> Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred— whether by explicit agreement or by silent combination or understanding with

**12.** It was established that terminated distributors of another newspaper, the Sacramento Union, were paid $1.00 per subscriber. But this payment was expressly provided for in the Sacramento Union's distributorship contracts. There is no similar provision in plaintiffs' contracts with McClatchy. Even under the Sacramento Union's contracts no sale of a distributorship has been made "after [a] dealer was terminated and the termination was unrescinded." The circulation manager of the Sacra-

mento Union testified that he had twice rescinded terminations, but that the rescissions were not granted for the purpose of giving the distributors an opportunity to sell their routes.

**13.** For the same reasons, plaintiffs were not entitled to injunctive relief on the sale-of-business claim under § 16 of the Clayton Act, 15 U.S.C. § 26, providing such relief "against threatened loss or damage by a violation of the antitrust laws."

his vendee—is a *per se* violation of § 1 of the Sherman Act.

388 U.S. at 382, 87 S.Ct. at 1867.[14]

Although the wisdom of per se rules with respect to territorial restraints has been the subject of substantial commentary,[15] the Supreme Court has adhered to *Schwinn* and, indeed, has expanded its prohibition. In *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), the Court held that horizontal as well as vertical territorial restraints were unlawful per se, rejecting the trial court's conclusion that the anticompetitive effect of a territorial restraint on intrabrand competition was outweighed by the increased ability of dealers in Topco-brand products to compete in the interbrand market. In justifying the per se approach in this area, the Supreme Court said (405 U.S. at 609–10, 92 S.Ct. at 1134):

> The fact is that courts are of limited utility in examining difficult economic problems. Our inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated *per se* rules.

The Court noted (405 U.S. 609–10 n. 10, 92 S.Ct. 1134):

Without the *per se* rules, businessmen would be left with little to aid them in predicting in any particular case what courts will find to be legal and illegal under the Sherman Act. Should Congress ultimately determine that predictability is unimportant in this area of the law, it can, of course, make *per se* rules inapplicable in some or all cases, and leave courts free to ramble through the wilds of economic theory in order to maintain a flexible approach.

As the Fifth Circuit recently observed: "[W]e must accept the fact that the Court has set its face against both horizontal and vertical territorial restrictions, with the possible exception of vertically imposed restrictions by 'new entrants' and 'failing companies' briefly mentioned in *Schwinn*." *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 943 (5th Cir. 1975).[16]

Defendants contend that application of *Schwinn* to the distribution of newspapers will be destructive of an orderly system essential to timely delivery of perishable news and advertising. There is nothing to indicate that independent distributors, their livelihood at stake, would fail to make timely delivery unless competition among them were eliminated by territorial restrictions. Lawful means less restrictive of intrabrand competition are available if required to assure effective distribution.[17] Defendants'

**14.** The opinion in this case deals only with the precise type of territorial restriction involved in *Schwinn*. We intimate no view whatever as to the rule to be applied to other dealer restrictions such as the location clauses involved in *GTE Sylvania, Inc. v. Continental T. V., Inc.*, No. 71–1705, now under submission to the court in banc.

**15.** *See, e. g.,* Averill, *Sealy, Schwinn and Sherman One: An Analysis and Prognosis,* 15 N.Y. L.F. 39 (1969); Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division,* 75 Yale L.J. 373 (1966); Chadwell & Rhodes, *Antitrust Aspects of Dealer Licensing and Franchising,* 62 Nw.U.L.Rev. 1 (1967); Comanor, *Vertical Territorial and Customer Restrictions: White Motor and Its Aftermath,* 81 Harv.L.Rev. 1419 (1968); McLaren, *Territorial and Customer Restrictions, Consignments, Suggested Retail Prices and Refusals to Deal,* 37 Antitrust L.J. 137 (1967); Zimmerman, *Distribution Restrictions After Sealy and Schwinn,* 12 Antitrust Bull. 1181 (1967); Editorial Note,

*Territorial and Customer Restrictions: A Trend Toward a Broader Rule of Reason?,* 40 Geo. Wash.L.Rev. 123 (1971); Note, *Territorial Restrictions and Per Se Rules—A Reevaluation of the Schwinn and Sealy Doctrines,* 70 Mich.L. Rev. 616 (1972); Note, *United States v. Arnold, Schwinn & Co.—Vertical Customer and Territorial Restrictions and the Sherman Act,* 63 Nw.U.L.Rev. 262 (1968); Comment, *The Impact of the Schwinn Case on Territorial Restrictions,* 46 Texas L.Rev. 497 (1968); Case Comment, *Horizontal Territorial Restraints and the Per Se Rule,* 28 Wash. & Lee L.Rev. 457 (1971).

**16.** Policy arguments against the *Schwinn* per se rule are examined and rejected by Judge Wisdom in an extensive footnote, 506 F.2d at 941–43 n. 5.

**17.** The decree on remand in *United States v. Topco Associates, Inc., supra,* allowed creation of territories of primary responsibility, so long

argument of necessity is particularly surprising in view of their equally vigorous insistence that they did not impose territorial restrictions on their distributors.

In any event the argument that need for speedy delivery of perishable products justifies an exception to the *Schwinn* per se rule has been rejected whenever raised. *Adolph Coors Co. v. FTC,* 497 F.2d 1178, 1187 (10th Cir. 1974); *Fairfield County Beverage Distributors, Inc. v. Narragansett Brewing Co.,* 378 F.Supp. 376, 378 (D.Conn.1974); *cf. Copper Liquor, Inc. v. Adolph Coors Co., supra,* 506 F.2d at 947. In *Albrecht v. Herald Co.,* 390 U.S. 145, 153–54, 88 S.Ct. 869, 874, 19 L.Ed.2d 998 (1968), a price-fixing case involving an independent newspaper distributor, the Supreme Court indicated that the *Schwinn* per se rule would be held applicable to just such a case as this.[18]

In *Adolph Coors Co. v. FTC, supra,* the Court of Appeals for the Tenth Circuit reluctantly applied *Schwinn* to the distribution of a perishable product, expressing the hope that "the Supreme Court may see the wisdom of grafting an exception to the *per se* rule when a product is unique and where the manufacturer can justify its territorial restraints under the rule of reason." But an exception to *Schwinn* based upon asserted uniqueness of product would be difficult to administer, and would introduce an element of uncertainty the per se rule was intended to eliminate. *United States v. Topco Associates, Inc., supra,* 405 U.S. at 609 n. 10, 92 S.Ct. 1126. As we read the *Schwinn* opinion, manufacturers may avoid the per se rule only by vertical integration or adoption of agency or consignment methods of distribution.[19] Manufacturers who wish to enjoy the advantages of distribution through independent entrepreneurs must be prepared to accept the burdens of *Schwinn.*

Manufacturers have a significant incentive to distribute their products through independent contractors rather than through employees, agents or consignees. Use of independent distributors avoids the substantial investment, expense, and risk imposed on agents or consignees of the manufacturers. The Court said, 388 U.S. at 380, 87 S.Ct. at 1866:

> Where the manufacturer retains title, dominion, and risk with respect to the product and the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer, it is only if the impact of the confinement is 'unreasonably' restrictive of competition that a violation of § 1 results from such confinement, unencumbered by culpable price fixing.

We reject defendants' suggestion that plaintiffs' distributorship was analogous to the agency and consignment situations referred to in *Schwinn.* The distributorship contract expressly provided that the distributor was to be "an independent wholesale distributor and not . . . an employee." Conklin testified that plaintiffs were "dealt with as independent contractors," and the record establishes that plaintiffs in fact operated on this basis. They purchased their own trucks and equipment and hired their own employees. They agreed "to purchase" the Bee. Defendants concede that plaintiffs acquired title to the copies purchased. Plaintiffs could return unsold copies at cost, but assumed the full and substantial risk of loss from theft and other causes.

---

as the device was not used directly or indirectly to achieve or maintain territorial exclusivity. *United States v. Topco Associates, Inc.,* 1973 Trade Cas. ¶¶ 74,391, 74,485 (N.D.Ill.), aff'd mem., 414 U.S. 801, 94 S.Ct. 116, 38 L.Ed.2d 39 (1973). *See also White Motor Co. v. United States,* 372 U.S. 253, 271–72 & n. 12, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring).

18. The Court stated:

> Certainly on the record before us the Court of Appeals was not entitled to assume, as its reasoning necessarily did, that the exclusive [territorial] rights granted by [the newspaper] were valid under § 1 of the Sherman Act, *either alone or* n conjunction with a price-fixing scheme. *See United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 373, 379 [87 S.Ct. 1856, 1862, 1865, 18 L.Ed.2d 1249] (1967). The assertion that illegal price fixing is justified because it blunts the pernicious consequences of another distribution practice is unpersuasive. If, as the Court of Appeals said, the economic impact of territorial exclusivity was such that the public could be protected only by otherwise illegal price fixing itself injurious to the public, the entire scheme must fall under § 1 of the Sherman Act. (Emphasis added).

19. *Schwinn* approved a "rule of reason" approach to territorial and customer restraints

incident to alternate methods of distribution.

The record in this case reflects other benefits. Paul Rothman, former circulation director of the Sacramento Union, testified, "the cost factor to have salaried employees in place of dealers would represent two and a half or more times outlay for the publisher." The difference, Rothman explained, is that "a dealer works seven days a week," usually with the help of other family members, and "takes care of his own transportation and equipment."[20] Robert Gilliland, plaintiffs' expert on newspaper circulation practices, testified that in addition to these obvious economic benefits, independent distributors are "normally a harder working group of people and . . . have a more serious concern about the operation than a salaried employee."

Because of such advantages to manufacturers, independent distributors continue to survive, and bring to the public the benefits of added competition in the distribution of goods and services. These benefits would be lost if manufacturers could obtain the private economic benefits of a system of distribution through independent businessmen, and at the same time restrict the freedom of such independent businessmen to compete. It was to prevent the wholesale destruction of this opportunity for competition that *Schwinn* forbade manufacturers to control the disposition of products after sale. "To permit this would sanction franchising and confinement of distribution as the ordinary instead of the unusual method which may be permissible in an appropriate and impelling competitive setting, since most merchandise is distributed by means of purchase and sale." 388 U.S. at 379, 87 S.Ct. at 1865.

Defendants contend there was no factual basis for a *Schwinn* instruction, because plaintiffs failed to establish that a split of their territory would have resulted in the imposition of a territorial restraint. Plaintiffs' distributorship contract did not define the boundaries of Newsstand 5, and did not expressly forbid plaintiffs from selling the Bee in areas other than Newsstand 5. Bua described the geographical boundaries of the city newsstand distributorship as areas of "primary responsibility," and on cross-examination Willard Noble answered in the affirmative when asked, "Now, as you understand it, this contract gave you an area of primary responsibility; did it not?" From this defendants argue that as a matter of law, no territorial restrictions existed.

The absence of an express territorial restriction is not fatal to plaintiffs' claim. There is no magic in the label "area of primary responsibility." It is enough if the restriction existed in fact, whether the product of an express or tacit understanding. *See United States v. Arnold, Schwinn & Co., supra*, 388 U.S. at 382, 87 S.Ct. 1856; *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 900 (5th Cir. 1973); *Beverage Distributors, Inc. v. Olympia Brewing Co.*, 440 F.2d 21, 28 (9th Cir. 1971); Zimmerman, *Distribution Restrictions After Sealy and Schwinn*, 12 Antitrust Bull. 1181, 1187–88 (1967). *But see Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637, 639 (10th Cir. 1973).

The jury could have inferred the existence of a tacit understanding from the evidence of numerous "suggestions" to plaintiffs that they split their territory, and from the testimony of Gallagher and two other city newsstand distributors that they

---

**20.** Rothman testified:

A. Well, a dealer works seven days a week, because it's his business. His wife usually takes care of his books. If he has a couple of boys they carry a paper route. If it was an employee setup, they would be working five days a week, forty hours a week, and you would have to have one and a third man for each dealership plus the fact that you would have to have a relief man for it, plus the fact that anytime that they worked beyond that forty hours, and this dealership is practically a twenty-four hour affair, in case of an emergency, why, you would have to pay all that overtime, plus the fact that you would have to supply trucks, vehicles of all kinds, where the dealership, the dealer takes care of his own transportation, plus the fact that you would have to buy or print all your various forms which the dealer either pays for now or buys it himself.

always stayed within their assigned territories. *See Beverage Distributors, Inc. v. Olympia Brewing Co., supra,* 440 F.2d at 30. Willard Noble testified that there were "some fuzzy areas" at the boundaries of Newsstand 5, and admitted that he had unsuccessfully sought to have his "boundary lines spelled out." Nevertheless, the boundaries were sufficiently definite that at trial Bua was able to outline all city newsstands on a street map of the Sacramento area. When plaintiffs' distributorship was split following termination, Bua marked out the boundaries of the two new distributorships on a map in his office. Bua exhibited this map to defendants Gallagher and Downing, plaintiffs' replacements. Gallagher testified that he knew the area he was going to take over "in terms of its definition by street boundaries."

The jury could have found, therefore, that the proposed division of plaintiffs' distributorship would have involved the imposition of a territorial restraint. There was also sufficient evidence that plaintiffs' refusal to agree to divide their distributorship was a substantial factor in their termination. Thus, the jury may have based the verdict for defendants upon a finding that the territorial restraint was not an unreasonable burden on commerce. Since under *Schwinn* the jury should have been instructed that such territorial restrictions are per se unreasonable, the judgment for defendants on the termination claim must be reversed and remanded for a new trial.

■ We do not agree with plaintiffs that a new trial is also required on the monopolization claim. Plaintiffs complain because the court instructed the jury that plaintiffs must prove that defendants "willfully acquired or willfully maintained monopoly power" *and* "had the intent and purpose to exercise the monopoly power." Plaintiffs correctly point out that while a general intent is required for actual monopolization it may be shown by proof of the willful acquisition or maintenance of monopoly power,[21] and it was improper for the court to state that both were required, as if they were independent. Although plaintiffs are technically correct, we think the redundancy was harmless.[22]

■ Two rulings of the trial court should be considered in view of the remand for a new trial. It was not error to exclude evidence that McClatchy deleted allegedly anticompetitive provisions in the distributorship contracts after plaintiffs' termination. Plaintiffs argue that "an inference of guilt or wrongdoing may be drawn" from such evidence; but it is well settled that evidence of subsequent remedial measures is not admissible to prove culpability of prior conduct. *See Boeing Airplane Company v. Brown,* 291 F.2d 310, 315 (9th Cir. 1961); Federal Rules of Evidence, Rule 407.[23]

■ We think it was error, however, to inform the jury that "it is the function and duty of the court in the event that you should award damages to treble that amount in the judgment." The sole function of the jury was to determine the amount of the damage actually sustained. The "probable consequence" of advising the

---

21. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Griffith,* 334 U.S. 100, 105–07, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

22. It was harmless error, if error at all, to admit the published circulation reports of the Woodland Daily Democrat, the Grass Valley Union and the Calusa Sun Herald, without testimony from representatives of the newspapers that the reports were prepared in the regular course of business. The impact of the evidence was de minimis.

23. Plaintiffs contend that the contract changes were admissible to explain "the loss of market position by the Sacramento Bee after the filing of the lawsuit." We do not consider the merits of this argument. The evidence of the contract changes was not initially offered on this theory. Later defendants introduced an exhibit showing the Bee's circulation had declined from 1963 to 1971. Plaintiffs' counsel objected to the post-1969 figures, stating "if they are entitled to show what was happening in circulation since '69, I think we should be entitled to show that certain things were done that may have affected that circulation." Plaintiffs did not, however, re-offer proof of the contract changes.

jury of the tripling provision of section 4 of the Clayton Act, 15 U.S.C. § 15, "would be harmful—an impermissible lowering of the amount of damages." Such an instruction is an invitation to the jury to negate Congress' determination that actual damages should be trebled in order to deter antitrust violations and encourage private enforcement of the antitrust laws. *Pollock & Riley, Inc. v. Pearl Brewing Co.,* 498 F.2d 1240, 1242–43 (5th Cir. 1974).[24]

Defendants suggest that since jurors may be independently aware of the treble damage provision, an explanatory instruction is necessary to avoid jury confusion and the return of erroneous verdicts. "Our immediate reaction is that a district court can sufficiently instruct the jury to determine only *actual* damages. In those cases where an accidental revelation occurs, the court can give curative instructions to alleviate confusion." *Pollock & Riley, Inc. v. Pearl Brewing Co., supra,* 498 F.2d at 1243 (emphasis in original; footnotes omitted).

The judgment for defendants on the termination claim is reversed and remanded for a new trial consistent with this opinion. The judgment for plaintiffs on the sale-of-business claim is reversed and remanded with instructions to enter judgment n. o. v. for defendants. The judgment for defendants on the monopolization claim is affirmed.

WILLIAM P. GRAY, District Judge (concurring and dissenting):

I am glad to concur in Judge Browning's opinion, except with respect to its holding that the trial court should make no mention of treble damages in instructing the jury. I think that the trial court should "level" with the jury and make sure that the members thereof understand the respective responsibilities of jury and court with respect to damages, just as the trial judge in this case did.

Jurors, like other citizens, are entitled to know what the law is, even with respect to damages in antitrust cases; presumably, many of the people who serve on juries have some awareness in these matters. If no explanation is given as to who does the multiplying by three, the jury might well assume that the responsibility is theirs and thus do it without anyone becoming aware that the "damages" have already been trebled. A judge fixes damages in an antitrust case in full knowledge that the amount will be tripled; I see no valid reason why we should try to conceal from a jury the ultimate effect of their verdict.

## ON PETITION FOR REHEARING

The petition for rehearing was held pending the decision in *GTE Sylvania, Inc. v. Continental T.V., Inc.,* 537 F.2d 980 (9th Cir. 1976). It is now denied.

As noted in the opinion in this case (*see* note 14), this case and *GTE Sylvania* deal with different questions. This case and *Schwinn* involve the legality of restrictions upon the territory in which a purchasing dealer may resell. The majority opinion in *GTE Sylvania* considers whether "Sylvania's practice of fixing by agreement the locations from which Continental was authorized to sell Sylvania's products was illegal *per se* under Section 1 of the Sherman Act." *Id.* at 982. The majority opinion in *GTE Sylvania* approves the result reached in this case. However, it disapproves "any language in the *Noble* opinion that may be inconsistent with any of the majority's language" in *GTE. Id.* at 1004 n.42. Accordingly, we have reexamined the opinions in both cases. We conclude that there are no inconsistencies between them and therefore

**24.** *Accord, Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 665–67 (5th Cir. 1974); *Standard Indus., Inc. v. Mobil Oil Corp.,* 475 F.2d 220, 223–24 (10th Cir. 1973); *Semke v. Enid Auto Dealers Ass'n,* 456 F.2d 1361, 1370 (10th Cir. 1972); *Sablosky v. Paramount Film Distrib. Corp.,* 137 F.Supp. 929, 941–42 (E.D.Pa.1955); *Webster Motor Car Co. v. Packard Motor Car Co.,* 135 F.Supp. 4, 10–11 (D.D.C.1955), *rev'd on other grounds,* 100 U.S.App.D.C. 161, 243 F.2d 418 (1957). *But see Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc.,* 203 F.2d 676, 678–79 (2d Cir. 1953); *Cape Cod Food Prods., Inc. v. National Cranberry Ass'n,* 119 F.Supp. 900, 911 (D.Mass.1954).

make no modification of the language of the opinion in this case.